[Civ. No. 25613. Fourth Dist., Div. Two. Nov. 6, 1981.]

JAMES M. CRAMER, as District Attorney, etc., Petitioner and Respondent, v.
GILLERMINA R., Objector and Appellant.

[Civ. No. 25604. Fourth Dist., Div. Two. Nov. 6, 1981.]

JAMES M. CRAMER, as District Attorney, etc., Petitioner and Respondent, v.
MICHAEL L., Objector and Appellant.

[Civ. No. 25605. Fourth Dist., Div. Two. Nov. 6, 1981.]

JAMES M. CRAMER, as District Attorney, etc., Petitioner and Respondent, v.
LINDA C., Objector and Appellant.

COUNSEL

Charles E. Ward, Public Defender, Littleton M. Gunn and Stephen P. Levine, Deputy Public Defenders, for Objectors and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Harley D. Mayfield and Jay M. Bloom, Deputy Attorneys General, for Petitioner and Respondent.

OPINION

THE COURT.*—Appellants are all severely mentally retarded individuals institutionalized at Patton State Hospital.

Michael was originally committed to Patton on November 19, 1979, by the Superior Court, San Diego County, pursuant to Welfare and Institutions Code section 6500.[1] He is a 34-year-old with an I.Q. of 39. Because a section 6500 commitment automatically expires annually, a petition for recommitment was filed by the district attorney on November 13, 1980. On the same day, the superior court issued an ex parte, temporary "hold" order placed on Michael. As a basis for this order, the district attorney presented records from Patton, including diagnostic reports and evaluation from different doctors and psychiatrists. They reveal that Michael becomes intermittently aggressive and violent, making him a danger to both himself and others. On February 19, 1981, Michael was recommitted following a formal, judicial hearing on the petition. Michael contends the interim hold order violated his constitutional rights.[2]

Linda's story is much the same. She is a 24-year-old with an I.Q. of 32. Her retardation stems from unknown causes. She was diagnosed as schizophrenic and autistic at the age of two. Originally she was voluntarily admitted to Patton. She also claims to have been involuntarily

---

*Before Gardner, P. J., McDaniel, J., and Morris, J.

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Apparently the hearing on Michael's petition was originally set for January 22, 1981, but postponed at the request of Michael's counsel.

confined on a hold order from December 11, 1980, until February 19, 1981.[3]

Gillermina is a 16-year-old female with an I.Q. of 6. Her mental retardation is attributable to a postnatal head injury. Although the record is somewhat sketchy, Gillermina was voluntarily admitted to Patton in 1979. It appears that she was placed on a hold from May 15, 1980, until January 22, 1981, at which time she was formally recommitted on a petition filed by the district attorney. The district attorney presented the same type of information to obtain a hold order with respect to Linda and Gillermina as with respect to Michael.

Appellants make identical contentions: (1) that a mentally retarded individual is entitled to a judicial, probable cause hearing prior to any formal hearing on a recommitment petition; and (2) that such individual is entitled to credit for time spent in the institution from the date of the temporary hold order until formal recommitment takes place. The trial court determined that appellants were entitled to a nonadversarial probable cause hearing, and that either judicial or administrative review of the written reports and evaluations compiled at Patton satisfied this standard. On this basis, the hold orders were issued. Further, the trial court determined appellants were not entitled to credit.

## I.

Appellants' first point is now moot, since they have been recommitted following a formal hearing. However, we elect to exercise our judicial discretion to decide this case because the issues are of public interest, and will inevitably continue to escape review both as to appellants and the public at large.[4] (*Baber* v. *Superior Court* (1980) 113 Cal.App.3d 955, 959-960 [170 Cal.Rptr. 353].)

---

[3]The hearing on Linda's petition was also continued at counsel's request from January 16, 1981, until February 19, 1981.

[4]We disagree with the trial court's apparent analysis of mootness, namely, that the parties stipulated the issues were not moot. It is fundamental constitutional law that the parties, no matter how eager, cannot compel a court to decide a hypothetical question when no case or controversy exists. The principle applies to both problems of mootness (*Kremens* v. *Bartley* (1977) 431 U.S. 119 [52 L.Ed.2d 184, 97 S.Ct. 1709]) and ripeness (*Regional Rail Reorganization Act Cases* (1974) 419 U.S. 102 [42 L.Ed.2d 320, 95 S.Ct. 335]). A court may decide a moot case under recognized exceptional situations, but the court acts as a matter of judicial discretion, and not through any compulsion or direction by the parties.

Moving to the merits, appellants argue they were involuntarily detained pending recommitment in violation of both procedural due process and equal protection under the California Constitution, article I, section 7. The threshold consideration in each instance is whether a person has been deprived of "life, liberty, or property." The People erroneously assert that because appellants' recommitment is technically civil, rather than criminal in nature, these constitutional rights are not implicated. Not so. Our Supreme Court has repeatedly explained that "the interests involved in civil commitment proceedings are no less fundamental than those in criminal proceedings and that liberty is no less precious because forfeited in a civil proceeding than when taken as a consequence of a criminal conviction." (*In re Gary W.* (1971) 5 Cal. 3d 296, 307 [96 Cal.Rptr. 1, 486, P.2d 1201]; *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 224-225 [152 Cal.Rptr. 425, 590 P.2d 1].) Most recently, the Supreme Court stated that, "An involuntary civil commitment in a state hospital for the mentally ill is a commitment which requires the application of criminal due process standards. (*Conservatorship of Roulet* (1979) 23 Cal.3d 219, 224-225 [152 Cal.Rptr. 425, 590 P.2d 1.)" (*In re Hop* (1981) 29 Cal.3d 82, 89 [171 Cal.Rptr. 721, 623 P.2d 282].)

Before our analysis proceeds, it is necessary to discuss briefly the statutory system appellants attack. A mentally retarded person may be committed to the State Department of Developmental Services if "he is a danger to himself or others." (§ 6500.) Generally, the district attorney will file a petition making this allegation, and the case will be set for a formal hearing. The hearing shall be set no more than 60 days after the filing of the petition, unless good cause is shown.[5] (§ 6503, amended by Stats. 1980, ch. 859, § 3, p. 2690). The hearing must be noticed. (§ 6504.) Pending the hearing, the court may order that the alleged dangerous mentally retarded person be left in the custody of his parent, guardian, conservator, or a state hospital for the developmentally disabled. (§ 6506.)

Appellants claim a denial of equal protection because mentally ill individuals committed under the Lanterman-Petris-Short (LPS) Act may be entitled to a probable cause hearing after a three-day emergency commitment. (*Doe v. Gallinot* (C.D.Cal. 1979) 486 F.Supp. 983,

---

[5]All three appellants' hold periods straddled the effective date for the amendment of section 6503.

affd. on appeal (9th Cir. 1981), 657 F.2d 1017.) *Doe* held that a person who is allegedly "gravely disabled" (§ 5150) may not be certified for 14 days of intensive treatment without a probable cause hearing. (§ 5250.) Neither a judicial nor adversarial probable cause hearing was mandated by *Doe.* Referring to the form of the hearing, *Doe* explained, "Due process is safeguarded only by a hearing at which a person or group of persons independent of the mental hospital conducts an evaluation to determine whether there is probable cause for detaining the person." (*Doe,* at p. 994.) Therefore, appellants' contention that *Doe* somehow entitles them to a judicial, adversarial probable cause hearing amounts to a misreading of *Doe.*

Assuming, however, we viewed *Doe* as through appellants' rose-colored glasses and as something other than a candle in the wind (see Note, *"Who Says I'm Crazy?"—A Proposal for Mandatory Judicial Review of Emergency Detention in California* (1978), 51 So.Cal.L.Rev. 695), appellants' equal protection argument still does not wash.

■ "The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification affecting two or more *similarly situated* groups in an unequal manner." (Citation omitted, italics in orig.; *In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549].) "A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'" (*Reed v. Reed* (1971) 404 U.S. 71, 76 [30 L.Ed.2d 225, 229, 92 S.Ct. 251], quoting *Royster Guano Co. v. Virginia* (1920) 253 U.S. 412, 415 [64 L.Ed. 989, 990-991, 40 S.Ct. 560].)

■ Appellants are not similarly situated with the *Doe* plaintiff because they suffer from mental retardation, not mental illness. "Although courts and legislators in many instances failed to distinguish between the mentally and emotionally ill and the mentally retarded, there is no question that mental illness and mental retardation are separate and distinct conditions which require different treatment and/or habilitation." (*Inst. Juveniles v. Secretary of Public Welfare* (E.D.Pa. 1978) 459 F.Supp. 30, 48 (Broderick, J., dis.), revd. *Secy. of Pub. Welfare v. Institutionalized Juveniles* (1979) 442 U.S. 640 [61 L.Ed.2d 142, 99 S.Ct. 2523].) "Mental retardation is an impairment in learning capacity and adaptive behavior .... Mental retardation is not an illness to be treated with drugs and therapies which have been developed for the

mentally and emotionally ill." (*Id.*) The United States Supreme Court has also stressed the same factual distinction. (*Kremens* v. *Bartley* (1977) 431 U.S. 119, 135-136 [52 L.Ed.2d 184, 196-197, 97 S.Ct. 1709].) The Legislature has recognized this factual distinction and created a coherent scheme for treating mental illness (§ 5150 et seq.) and a different scheme for treating mental retardation (§ 6500 et seq.). These schemes are not unconstitutional on equal protection grounds because the classifications are based upon accepted factual and medical differences between the mentally retarded and mentally ill. Moreover, the state has a substantial interest in the continuity of treatment programs for mentally retarded patients who have been committed over a longer term, which is simply qualitatively different than the treatment objectives for someone confined three days. (*Doe, supra.*) The procedures are different because the treatment objectives are understandably different. (See *In re Eric J., supra*, 25 Cal.3d at p. 531.)[6]

Appellants inexplicably shy away from any direct discussion of the procedural due process problem inherent in the recommitment statutes. (§§ 6503, 6506.) This omission is somewhat perplexing inasmuch as the underlying thrust of their argument is that due process compels an adversarial probable cause hearing.

■ An examination of procedural due process requires consideration of four factors: (1) the private interest that will be affected by the official action; (2) the dignitary interests in informing the individual of the nature, grounds, and consequences of the action proposed; (3) the risk of an erroneous deprivation of the private interest by the decision making procedure utilized; and (4) the government interest, including the fiscal and administrative burdens that additional procedural requirements would entail. (*People* v. *Ramirez* (1979) 25 Cal.3d 260, 269 [158 Cal.Rptr. 316, 599 P.2d 622].)

---

[6]Appellants are also not similarly situated with *Doe* because they are recommittees to Patton. In *Doe*, plaintiff was contesting his initial confinement for up to 17 days (72-hour emergency detention, plus 14-day intensive treatment period) without a probable cause hearing. By sharp distinction, appellants have already been institutionalized for a year or longer, and challenge their recommitment. They have already been accorded one or more hearings of a nature far more substantial than a probable cause hearing to justify their previous commitment. As we recently explained in the equal protection context, "once commitment has occurred the need for identical procedures ceases." (*Baber* v. *Superior Court, supra*, 113 Cal.App.3d 955, 963-964 [170 Cal.Rptr. 353].)

■ The private interest involved here is appellants' liberty. Civil commitment entails a massive curtailment of one's liberty. (*Humphrey v. Cady* (1972) 405 U.S. 504 [31 L.Ed.2d 394, 92 S.Ct. 1048]; *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 223-228 [152 Cal.Rptr. 425, 590 P.2d 1].) There can be no doubt that the hold order defeats a legitimate expectation of liberty at the end of one year.

Nor can we suggest that appellants' dignitary interests are trifling or insignificant. Despite benevolent feelings of sympathy toward the mentally ill, our Supreme Court recently observed that significant stigmatization occurs as a result of categorizing an individual as mentally ill. (*Conservatorship of Roulet* (1979) 23 Cal.3d 219, 229, fn. 7 [152 Cal. Rptr. 425, 590 P.2d 1].) The same observation applies equally to those who are mentally retarded.

Nevertheless, *Ramirez* requires not only that we identify these interests in the abstract, but discuss their relevancy to the specific problem presented. This is because "'due process is flexible and calls for such procedural protections as the particular situation demands.'" (*Ramirez, supra*, 25 Cal.3d at p. 268, quoting *Morrissey v. Brewer* (1972) 408 U.S. 471, 481 [33 L.Ed.2d 484, 494, 92 S.Ct. 2593].) In this light, we make several observations concerning appellants' status as potential recommittees to Patton.

First, the Legislature has expressly provided that all section 6500 commitments expire annually. This itself expresses a concern that patients not be institutionalized without systematic review. It places the burden on the state to justify continued commitment, rather than forcing the individual to seek release through habeas corpus. Further, appellants ignore the statutory limit of 60 days established by the Legislature for hold orders. It appears Gillermina would have been entitled to her release on this statutory basis alone.

Second, we question the incremental increase in the loss of dignity and stigmatization which results from a short term, temporary hold pending a recommitment hearing. Appellants already have been judicially determined to be mentally retarded. Thus, stigmatization has already taken place. This is not a situation where the challenged detention is the initial indicia of mental illness (cf. *Doe v. Gallinot, supra*, 486 F.Supp. 983), nor is it the initial indicia of mental retardation (cf. *In re Hop, supra*, 29 Cal.3d 82). Appellants have unfortunately already lost any employment, or contact with friends outside the institutional

setting. Thus, the interim extension of institutionalization, with the objective of further extending commitment, does not pose the same spectre of stigmatization as those who might be detained on a hold order pending an initial commitment.

Balanced against these considerations, we consider closely the risk of erroneous decision making in the nonadversarial procedure used by the trial court.

Appellants contend that only an adversarial preliminary hearing akin to criminal proceedings (Pen. Code, § 859b) will deter erroneous decision making. They paint a picture of an ex parte hearing where grave decisions are cavalierly made on the flimsiest of evidence. Insofar as these appellants are concerned, the record tells a somewhat different tale. This is not a situation where an individual, previously functioning as a normal member of society, is thrust into an institutional setting upon an isolated event or series of events. (Cf. *Doe* v. *Gallinot, supra*; *Lessard* v. *Schmidt* (E.D.Wis. 1972) 349 F.Supp. 1078; *Lynch* v. *Baxley* (M.D.Ala. 1974) 386 F.Supp 378; *Doremus* v. *Farrell* (D.Neb. 1975) 407 F.Supp. 509.) For example, in Michael's case, the court was confronted with a multitude of reports, evaluations, and daily log sheets from Patton chronicling his behavior over the past 12 months.[7]

While the possibility of an erroneous commitment always exists, "[P]rocedural due process rules are shaped by the risk of error inherent

---

[7]At the time the trial court placed a "hold" on Michael pending a formal hearing the following data was available for consideration: (1) Interdisciplinary team review, prepared by a committee of four mental health professionals on August 20, 1980. The report notes Michael's severe retardation, mixed seizures (Jacksonian, Grand Mal), assaultive behavior on the average of twice a week, public masturbation, and anal intercourse with passive male peers; (2) social history evaluation and update (4/7/80) prepared by a Patton psychiatric social worker; (3) social history evaluation and update (12/26/79) prepared by a different Patton psychiatric social worker; (4) psychological assessment (5/24/77) prepared by a Patton clinical psychologist; (5) nursing assessment update (8/29/80) prepared by a Patton clinical nurse; (6) San Diego regional center quarterly update (June-August 1980) prepared 8/28/80 by a social work counselor, state hospital liaison unit; (7) San Diego regional center review 5/12/80 by the same social work counselor; (8) psychological evaluation of Dr. Robert C. Newman II; (9) psychological evaluation of Dr. Thomas McSpeiden, December 1979; (10) San Diego regional center incident report dated 9/23/80, indicating Michael recently inserted five sewing needles in his rectum and thigh following the interdisciplinary team review; (11) daily log notes from Patton reflecting Michael's activity.

We could elaborate on the data contained in all of the above. It is pointless. They reflect a severely retarded, aggressive, sexually disoriented young man. None of the evaluations, including the interdisciplinary team review recommended releasing Michael from institutional treatment.

in the truthfinding process as applied to the generality of cases, not the rare exceptions." (*Mathews* v. *Eldridge* (1976) 424 U.S. 319, 344 [47 L.Ed.2d 18, 39, 96 S.Ct. 893].) Diagnosis of mental illness and predictions of future behavior are essentially medical in character. (*Parham* v. *J. R.* (1979) 442 U.S. 584, 609 [61 L.Ed.2d 101, 123, 99 S.Ct. 2493].) This type of inquiry is not so easily adaptable to procedural due process safeguards as are decisions which turn on factual matters such as whether a person has violated a condition of parole (*Morrissey* v. *Brewer, supra*) or whether a person has engaged in conduct subject to discipline (*Goss* v. *Lopez* (1975) 419 U.S. 565 [42 L.Ed.2d 725, 95 S.Ct. 729]). (See generally, *Board of Curators Univ. of Mo.* v. *Horowitz* (1977) 435 U.S. 78, 87 [55 L.Ed.2d 124, 133, 98 S.Ct. 948] (question whether medical student qualified to remain in program not a "factual" one); *Stretten* v. *Wadsworth Veterans Hospital* (9th Cir. 1976) 537 F.2d 361 (physician's dismissal from hospital residency program not amenable to adversarial hearing).) Thus, the perceptible benefit of an adversarial hearing at this stage is subject to question.

Our Supreme Court has recognized that not every deprivation of a liberty interest automatically triggers the immediate right to an adversarial hearing. In *Ramirez*, a CRC outpatient challenged his dismissal by the program director. The patient contended he was entitled to confront and cross-examine witnesses in challenging the director's decision. The Supreme Court, while acknowledging the patient's right to orally respond to an exclusion decision before it became final, rejected the cross-examination claim. "[T]he Director's decision is evaluative in nature and based on his specialized subjective judgment; that judgment depends on consideration of a host of intangible factors rather than on the existence of particularized and contestable facts." (25 Cal.3d at p. 275.)

Next, we consider the state's interest in continuing confinement pending recommitment. Because interim confinement is premised upon some showing of appellants' continued dangerousness to themselves or others, the state's interest is substantial. The ex parte documents indicate, for example, that Michael is prone to have seizures, attack other patients inflicting bodily injury, insert foreign objects into his rectum, and sexually fondle or assault other patients. It is an understatement of some proportion to say these are serious behaviorial problems which make out a rather strong prima facie case that Michael remains dangerous both to himself and members of society. The state also maintains a somewhat less weighty interest in assuring the continuity of its treatment

programs, so that individuals are not automatically released after one year only to be reinstitutionalized after a relapse once released into society. (See Note, *Developments in the Law—Civil Commitment of the Mentally Ill* (1974) 87 Harv.L.Rev. 1190, 1386-1389.)

Upon balance, we conclude that appellants may be detained pending a judicial recommitment hearing without an adversarial probable cause hearing.[8] The documents filed by the district attorney in the present cases make a strong showing that appellants, if released temporarily pending a full hearing, would be a danger both to themselves and others. We attach considerable weight to the fact that, at best, the quality of decision making would be only marginally enhanced through an adversarial hearing because the issues presented rest heavily upon subjective evaluations. Undoubtedly, our holding would be different if there were no available subsequent judicial hearing to test the recommitment. Our holding is not out of tune with Supreme Court decisions in related areas. For example, no formal probable cause hearing is required to revoke the outpatient status of a CRC patient when the medical needs of the patient demand action, and a formal hearing follows. (*In re Bye* (1974) 12 Cal.3d 96 [115 Cal.Rptr. 382, 524 P.2d 854].) Somewhat similarly, exclusion from CRC and reinstitution of criminal proceedings does not require a preexclusion probable cause hearing because of institutional needs to immediately weed out aggressive and sophisticated criminals. (*Ramirez, supra*, 25 Cal.3d 260.)

While we agree with the trial court that confrontation, cross-examination and other formal hearing rights are not constitutionally required elements of due process prior to a hold order issuing, we do believe appellants are entitled to appear before the court and orally respond to the grounds for the hold order before it is issued. Because appellants may lack the mental faculties to respond, they may be assisted by a guardian in this respect.

The purpose of this opportunity is twofold. First, it provides the chance for the court to observe the patient, and weigh the largely subjective observations of the psychiatrists and case workers against the patient's appearance and demeanor. As *Ramirez* stated: "[o]ral participation may be useful in resolving conflicting information and in the introduction of subjective factors into the decision-making process that might otherwise not be considered ...." (*Id.*, at p. 275.) Moreover,

---

[8]Our holding applies only to appellants' situation involving recommitment.

even if participation is limited or nil, providing an opportunity to respond and be observed by someone outside of the institutional setting promotes a feeling that the patient's dignity is being respected by the government.

Delay in the actual hearing on the petition may not exceed 60 days in any event. (§ 6503.) The district attorney must make every effort to file the petition sufficiently far in advance that no hold order is necessary, including the time required to notice the hearing (§ 6504) and make all examinations of the mentally retarded person. (§ 6504.5.) Both Michael and Linda were afforded a hearing within two months, but for the continuance requested by their attorney. Gillermina's detention was approximately eight months—a delay that is not only shocking, but in clear contravention of the Legislature's intent that mentally retarded persons shall be reviewed no more than fourteen months after their last judicial review.

Last, appellants suggest that our Supreme Court's decision in *In re Hop* (1981) 29 Cal.3d 82 [171 Cal.Rptr. 721, 623 P.2d 282], mandates a contrary result. Although language in *Hop* can be read in such a broad fashion to require a probable cause hearing,[9] all that *Hop* held was that a developmentally disabled person initially committed by her mother under section 4825 is entitled to a judicial hearing to test the basis for the commitment. Thus, procedures relevant to due process involving recommitment were not at issue in that case. In any event, due process is "flexible" (*Ramirez, supra,* 25 Cal.3d 260), and we do not believe *Hop* mandates an adversarial probable cause hearing in the situation posed here.

## II

Appellants also contend they are entitled to credit for the time in custody from the hold order until recommitment. This claim is premised upon an equal protection argument, because the Legislature has not provided statutorily for preadjudication credits for developmentally disabled persons.

---

[9]*Hop* states: "An involuntary civil commitment in a state hospital for the mentally ill is a commitment which requires the application of criminal due process standards. (*Conservatorship of Roulet* (1979) 23 Cal.3d 219, 224-225 [152 Cal.Rptr. 425, 590 P.2d 1].) Any confinement in a state hospital for the developmentally disabled must invoke the same standard." (29 Cal.3d at p. 89.)

To the extent appellants' credit argument is based upon comparison to the credit rights of a criminal defendant awaiting trial the analogy is badly strained. The underlying theory behind credit in criminal proceedings is that persons who are poor cannot make bail and would serve more total time in custody than wealthier defendants if they are not given credit for pretrial or presentence custody time. (*In re Banks* (1979) 88 Cal.App.3d 864 [152 Cal.Rptr. 111]; *In re Young* (1973) 32 Cal.App.3d 68 [107 Cal.Rptr. 915].)

As the Attorney General correctly observes, the same problem does not apply in a section 6500 proceeding because mentally retarded persons are not kept in custody because of their inability to post bail. Instead, the basis for custody before a commitment or recommitment hearing is dictated only by the needs and conditions of the person to be committed. (§ 6506.)

Insofar as appellants' argument may be read to make an equal protection argument based upon "good time" credit, it is also misdirected. This question was explored in the context of whether an MDSO at Patton was entitled to such credit. (*People* v. *Saffell* (1979) 25 Cal.3d 223, 234 [599 P.2d 92].) Even though the MDSO is in one respect similarly situated with criminal defendants because his criminal activity had resulted in his admission to Patton, the Supreme Court rejected this argument, stating: "the very concept of 'giving' or 'taking away' time credits might materially interfere with other principles central to the operation of a therapeutic program." (*Id.*) In sum, *Saffell* observed, "[T]he concept of 'good time' credit *only* has meaning within the context of a fixed criminal sentence which may not be so extended." (*Id.*, italics added.) Since the commitment for a mentally retarded person may extend for life (year after year) in some cases, no limited or fixed term of commitment exists to be reduced.

Appellants point out that denial of a credit defeats the legislative intent by allowing commitments to last longer than one year. But the Legislature has consciously permitted a 60-day holding period, and consciously *not* enacted legislation giving a credit or making the subsequent judicial determination retroactive to the date of the previously expired term. (Cf., § 5363 [ratification of acts beyond conservator's term retroactive].) Thus, we do not see that the denial of a credit defeats legislative intent, and reject appellants' request to judicially create a law which the Legislature, in its wisdom, has not seen fit to enact.

The judgment (order of commitment) in each case is affirmed. The views expressed herein regarding due process do not require modification of the judgment, since the matter is moot.

Appellants' petition for a hearing by the Supreme Court was denied January 20, 1982. Bird, C. J., and Newman, J., were of the opinion that the petition should be granted.