[No. A113242. First Dist., Div. Four. Oct. 10, 2007.]

Conservatorship of the Person and Estate of ROY WHITLEY.
NORTH BAY REGIONAL CENTER, Petitioner and Respondent, v.
VIRGINIA MALDONADO, Objector and Appellant.

COUNSEL

Severson & Werson, Jan T. Chilton, Donald J. Querio and Jeremy K. Ostrander for Objector and Appellant.

Farella Braun & Martel, Mark D. Petersen and Patrick McKinney for California Association of State Hospital/Parent Councils for the Retarded as Amicus Curiae on behalf of Objector and Appellant.

Reed Smith, Joseph P. Mascovich, Bette B. Epstein, David J. de Jesus; and Nancy Wilborg Ryan for Petitioner and Respondent.

Enright & Ocheltree, Julie A. Ocheltree, Judith A. Enright and Andrew J. Black for Association of Regional Center Agencies, Inc., as Amicus Curiae on behalf of Petitioner and Respondent and on behalf of Conservatee.

Eric R. Gelber and Ellen S. Goldblatt for Protection & Advocacy, Inc., as Amicus Curiae on behalf of Conservatee.

Edmund G. Brown, Jr., Attorney General, Thomas Yanger, Assistant Attorney General, Douglas M. Press and Susan M. Carson, Deputy Attorneys General, for California Department of Developmental Services as Amicus Curiae.

OPINION

RUVOLO, P. J.—

## I.

## INTRODUCTION

For over 20 years, Virginia Maldonado (Maldonado) has been the conservator for her developmentally disabled adult brother, Roy Whitley (Whitley). She appeals from an order of the superior court, entered over her objection after a two-day evidentiary hearing, granting the North Bay Regional Center's (NBRC) request to move Whitley from the Sonoma Developmental Center (SDC) to a smaller community facility in Fairfield, California. In this appeal, the sole issue we consider is whether it was appropriate to seek immediate relief in the superior court to resolve Maldonado's challenge to the change-of-placement decision.

The Legislature, in relevant provisions of the Lanterman Developmental Disabilities Services Act (Welf. & Inst. Code, § 4500 et seq.)[1] (hereafter the Lanterman Act), details the rights and relief available to a legal representative, such as Maldonado acting as Whitley's conservator, who believes a placement decision has been proposed that is not in her conservatee's best interests. Those statutory provisions direct that a legal representative's objection to a proposed community placement is to be resolved by an administrative fair hearing procedure followed by superior court review if the conservator, or another party, remains dissatisfied with the result. (§§ 4803, 4712.5, subd. (a).) Maldonado's attempt to invoke that statutory fair hearing remedy was improperly thwarted by NBRC's insistence on a judicial hearing in superior court as contemplated in the settlement of an unrelated federal case, *Richard S. v. Department of Developmental Services* (U.S. Dist. Ct., C.D. Cal., So. Div., Aug. 29, 2000, No. SACV97-219GLT (ANX)) (the *Richard S.* settlement).

We conclude the *Richard S.* settlement did not authorize the parties here to bypass the statutorily prescribed administrative fair hearing procedure. In these circumstances, we find that it was the intent of the Legislature to supersede all common law remedies with those provided for in the Lanterman Act. Therefore, the only means by which Maldonado, as a conservator, could object to NBRC's community placement decision was by invoking the statutorily authorized administrative fair hearing provisions of the Lanterman Act. Because Maldonado was improperly denied that administrative review, we reverse and remand so that the community placement planning process may be recommenced. If that process results in a decision to which Maldonado objects, she should be afforded her statutory right of review by an administrative fair hearing followed, if necessary, by court review. (See Code Civ. Proc., § 1094.5 [providing judicial review of final administrative proceedings].)

## II.

## FACTS

Whitley is a nearly 55-year-old severely developmentally disabled adult. He suffers from epilepsy, mild cerebral palsy and profound mental retardation caused by microcephaly. He cannot speak coherently, nor can he tell others when he is experiencing pain or needs medical attention. He requires some assistance to perform routine tasks such as bathing, dressing, grooming, and toileting at night. For his own safety, he must be closely supervised when outdoors in unfamiliar areas because he is unaware of hazards. He is

---

[1] All subsequent undesignated statutory references are to the Welfare and Institutions Code.

described as "quite the 'ladies man' " and someone who is "overly affection-ate and friendly towards strangers[,] . . . attempt[ing] to pat people on their behinds and or give kisses on their face, shoulder or a person's back." He can also be "strong-willed" and "resistive to following instructions . . . ."

Whitley lived with his family until 1960, when he was seven years old. At that point, his mother could no longer care for him due to his maladaptive behaviors and the other demands of her large family, and she had him admitted to Sonoma State Hospital (now SDC), an institution operated by the State Department of Developmental Services (DDS). Whitley lived at the SDC for the next 23 years.

In 1983, Whitley was moved from the SDC to a community facility. That same year, appellant was appointed Whitley's conservator. Approximately eight years later, in 1991, Whitley exhibited behavioral problems, including property damage, vocal disruption, incontinence, and aggression toward his peers, that resulted in Whitley's readmission to the SDC. When Whitley returned to the SDC in 1991, he initially lived in a locked residence known as Lathrop Cottage. In approximately 2001, Whitley moved into an unlocked residence known as Brent Cottage. While changes have been extremely difficult for Whitley, he has shown improvement in this area. For example, Whitley has successfully adapted to numerous changes to his daily routine at SDC, such as the move from Lathrop Cottage to Brent Cottage, working onsite at the SDC folding laundry, and interacting with new staff members as turnover occurred.

For more than 20 years, Maldonado has been Whitley's conservator, concerned with his care and welfare. A staff report notes that because Whitley is unable to give informed consent for treatment, he "depends upon his sister/conservator to do so on his behalf." She has participated fully as a member of his interdisciplinary team (IDT)[2] and has participated in Whitley's annual individual program plan (IPP) reviews.[3] She and Whitley's other relatives have maintained close contact with Whitley, giving him family

---

[2] Under California law, the IDT is referred to as the "planning team" and includes the consumer, his or her parents (or legally appointed guardian or conservator, as appropriate), the authorized representative, one or more regional center representatives, and any individual, including a service provider, invited by the consumer or his or her parents/conservator. (§ 4512, subd. (j).)

[3] The Lanterman Act grants persons with developmental disabilities the right to receive treatment and services to meet their needs, regardless of age or degree of handicap, at each stage of life. These individuals are "consumers" of the treatment and services they receive. (§ 4640.7 et seq.) The state must pay for these services through contracts with various private nonprofit corporations for the operation of regional centers for the developmentally disabled, such as NBRC, and requires regional centers to develop an IPP for each consumer that sets forth the treatment and services to be provided for the consumer. (§§ 4512, subd. (b), 4643

support. One of Whitley's nieces has visited him weekly at the SDC for the past four years. Another of Whitley's nieces has had him visit her at her home about once a month and for birthdays and holidays.

In the spring of 2005, Whitley's IDT began considering placing him at a community care facility in Fairfield called Miracle Lane. Miracle Lane is a small (four to five residents) community-based residential facility that was opened specifically to accommodate persons with developmental disabilities who do not require an institutional setting. Once it identified Miracle Lane as a suitable community placement for Whitley, his IDT developed a multipart plan to assist his gradual transition to this facility.

As part of this transition planning process, the individual who operates Miracle Lane and members of his staff met with Whitley and members of the staff at the SDC. As a next step, Whitley and the SDC staff visited Miracle Lane, where Whitley met some of the staff and residents there. Whitley's sister, brother-in-law, niece and great-niece also visited Miracle Lane. A day program, known as Dungarvin Day Program in Vacaville (Dungarvin), was also identified for Whitley to help him with community integration. The Dungarvin director met with Whitley at the SDC as well.

When Whitley's IDT held an IPP meeting on May 13, 2005, it discussed his placement at Miracle Lane. The report for this meeting shows that Maldonado and other family members attended this meeting and that Maldonado expressed her family's concerns about the distance they would have to travel to visit Whitley in Fairfield. The IDT believed, however, that Miracle Lane presented a viable community placement option for Whitley and continued to pursue his placement there.

On June 9, 2005, Whitley's IDT "met to discuss his IPP, including, as the law requires, the prospects of community placement." Consistent with the statutory requirements, persons attending the meeting included members of the IDT, several staff from the SDC who had worked with Whitley, as well as representatives of Miracle Lane and Dungarvin, the planned community service providers.

Maldonado had asked to participate in the meeting by telephone, but somehow her number was incorrectly transcribed and the team's efforts to reach her were unsuccessful. Nevertheless, the meeting proceeded without Maldonado. The IDT concluded that Miracle Lane appeared to be an ideal community facility for Whitley, and it was agreed to move forward with the final steps of the transition plan, selecting July 29, 2005, as the proposed date for his placement there.

et seq.) Section 4646, subdivision (b) provides that the consumer and his conservator "shall have the opportunity to actively participate in the development of the [IPP]."

Maldonado continued to voice her objection to the IDT's decision to place Whitley at Miracle Lane. Thereafter, the DDS (through the SDC) provided Maldonado with the documentation required under the settlement reached in *Richard S.*, an unrelated federal action. As explained more fully in a later part of this opinion, the *Richard S.* settlement dictates the procedures to be followed when a member of the consumer's IDT objects to a community placement decision. The *Richard S.* documentation sent to Maldonado expressly stated family members had "a forum for expressing their disagreement [with the community placement decision]" and if they wished to do so, they could file "a Request for Hearing Concerning Community Placement." Maldonado filled out the necessary paperwork, requesting a hearing to review the IDT's recommendation that Whitley be placed in a community setting.

Under the terms of the *Richard S.* settlement, the DDS must notify the superior court that has jurisdiction over the consumer's commitment of the IDT member's objection to community placement, and it remains within the court's discretion whether to hold a hearing or let the proposed community placement proceed.

On August 25, 2005, before a *Richard S.* hearing occurred, Maldonado also requested an administrative fair hearing under the Lanterman Act. The Office of Administrative Hearings then made several requests that Maldonado provide proof that she was Whitley's conservator. After Maldonado finally provided that proof, the Office of Administrative Hearings scheduled a hearing for April 21, 2006.

In November 2005, the court held a two-day *Richard S.* hearing.[4] At this hearing, Maldonado proffered evidence showing that transitions can be difficult for Whitley and that Miracle Lane is in a residential neighborhood on a busy street rather than in a rural setting, which Maldonado thought might raise safety problems. Whitley's family members also believed that if he were living at Miracle Lane, it would be difficult for them to visit him as often as they do at the SDC. Maldonado testified that she "remembered his experience when he was out in the community before, which was not successful" and that she "did not want to go through that again." Whitley's family members were joined by Whitley's attorney in expressing their desire that he remain at the SDC where he was happy and secure.

In response to these objections, NBRC presented testimony from persons who had worked closely with Whitley who believed he was capable of making the transition to a community placement, and who believed he

---

[4] An extended description of the facts and evidence at trial is unnecessary in light of our conclusion that the matter should not have been before the superior court in the first instance.

deserved a chance, given the benefits of moving him into a less restrictive community setting. NBRC's attorney argued, "maybe it won't work out. . . . And if it doesn't work out, he can go back to the [SDC]."

The transcript reveals the court had to create a *Richard S.* proceeding out of whole cloth, making many ad hoc legal determinations during the course of the hearing, such as establishing the burden of proof, identifying the key issues, and setting the standard of review. In articulating the applicable legal principles, the superior court characterized its review of the IDT's community placement decision as asking whether the IDT had abused its discretion. Thus, the court concluded that an IDT's determination that community placement provides the least restrictive appropriate environment should be upheld " 'unless it could be clearly demonstrated to be erroneous,' " and the objector has the burden of establishing that the recommendation should not be followed.

Against this procedural backdrop, the superior court found Maldonado had not carried the burden required to overturn the IDT's recommendation that Whitley be moved to Miracle Lane. However, the superior court retained jurisdiction and established a schedule to review and monitor Whitley's placement. The court ordered the NBRC to notify the court within 72 hours of Whitley's move to the community facility and that a hearing be held 30 to 45 days thereafter. The court also ordered the NBRC to make arrangements for Whitley to make monthly visits, at a minimum, with his family in Sonoma County.

Maldonado filed her notice of appeal from the superior court's ruling on February 6, 2006.[5] On April 13, 2006, the NBRC requested dismissal of the administrative fair hearing on the ground that "[t]he issue of Roy Whitley's placement is currently before the [C]ourt of [A]ppeal." Maldonado did not oppose the request to dismiss, which the Office of Administrative Hearings granted.

After Maldonado filed this appeal, Whitley was moved to Miracle Lane in Fairfield. This court granted Maldonado's petition for writ of supersedeas and issued an order staying enforcement of the superior court's ruling to maintain

---

[5] One of the briefs filed by amicus curiae seeks to enlarge the issues presented by the parties to this appeal to include the contention that Maldonado lacked standing to appeal the superior court's determination authorizing the community placement to proceed. We do not consider this argument. " ' "[A]n appellate court will consider only those questions properly raised by the appealing parties. Amicus curiae must accept the issues made and propositions urged by the appealing parties, and any additional questions presented in a brief filed by an amicus curiae will not be considered [citations]." ' " (*Younger v. State of California* (1982) 137 Cal.App.3d 806, 813–814 [187 Cal.Rptr. 310]; see *Lavie v. Procter & Gamble Co.* (2003) 105 Cal.App.4th 496, 502 [129 Cal.Rptr.2d 486].)

the status quo pending the resolution of this appeal. Consequently, Whitley was returned to the SDC and, to our knowledge, currently resides there.

## III.

## DISCUSSION

### A. Overview

██ In briefing this appeal, we asked the parties to focus on whether the superior court had the authority to conduct a *"Richard S."* hearing in the first instance, given that an administrative fair hearing procedure specifically targeting the kind of dispute now before us was contained in the Lanterman Act.[6] We have considered the views of the parties, as well as numerous amici curiae, applying a de novo standard of review on the question of whether or not this case was properly before the superior court. (See *Emeryville Redevelopment Agency v. Harcros Pigments, Inc.* (2002) 101 Cal.App.4th 1083, 1095 [125 Cal.Rptr.2d 12] [application of statutory provisions to undisputed facts presents a question of law].) The Supreme Court has justified consideration of a new issue on appeal for the first time "when the issue posed is purely a question of law based on undisputed facts, and involves important questions of public policy. [Citations.]" *(Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 654–655, fn. 3 [209 Cal.Rptr. 682, 693 P.2d 261].) Both of these factors are present here.

### B. The *Richard S.* Settlement

The *Richard S.* case was spawned in the face of the massive transfer of developmental center residents into the community by DDS and the regional centers in the mid-1990's. (See *Richard S. v. Dept. of Developmental Services* (9th Cir. 2003) 317 F.3d 1080, 1083–1084.) The complaint in *Richard S.* alleged that, in an effort to hasten the discharge of developmental center residents into the community, DDS and the regional centers engaged in " 'client shopping,' " where community group home owners would walk through developmental centers and select residents for placement in the community. (*Id.* at p. 1084.) It was alleged that DDS and the regional centers targeted residents who lacked a guardian or conservator who might object to

---

[6] We framed the pertinent issues on appeal as follows: "1) How a settlement agreement reached in an unrelated matter (the '*Richard S.*' case) can and does confer jurisdiction on the superior court in this matter; 2) if there is any authority (statutory, case law) conferring jurisdiction on the superior court; 3) what authority exists allowing the parties to bypass the administrative hearing procedure provided for in the Lanterman Act (see Welf. & Inst. Code, § 4700 et seq.); and 4) if there was no legal basis for the superior court proceeding, what remedy should this court provide appellant . . . ." (Order (May 16, 2006) Ruvolo, P. J.)

their transfer. (*Ibid.*) Also challenged was a DDS policy known as the " 'parental objection' " policy whereby a conservator or family member had an absolute veto power over moving a development center resident into a less restrictive community setting. (*Ibid.*)

By the terms of the settlement, whenever a recommendation is made that a developmental center resident is to be moved to a community living arrangement and a placement has been located, DDS sends a written notice of the intent to transfer to the superior court having jurisdiction over the resident. If any team member disagrees with the plans to move the resident into the community, the notice includes a statement to that effect along with a "Request for Hearing" form if the objector wishes to be heard on the issue of placement.

The settlement agreement goes on to provide that once notice to the superior court has been given, it is up to the court to determine whether or not it will hold a hearing. If the court takes no action on the request, the settlement agreement provides that the transfer to the community living arrangement proceeds as scheduled. If a hearing is scheduled, the transfer is not made until after the court's ruling.

Amicus curiae California Association of State Hospital/Parent Councils for the Retarded (CASH/PCR), a party to the *Richard S.* settlement, explains that the *Richard S.* settlement was intended to create a supplemental review process for IDT members who do not have fair hearing rights under the Lanterman Act. Unlike the right to initiate an administrative fair hearing, which is statutorily limited to an "applicant for or recipient of services" or "authorized representative" (§ 4710.5, subd. (a)), the settlement in *Richard S.* provides that objections to a proposed placement can be made by *any* member of the IDT who wishes to be heard on the issue of placement— which could include a psychologist, physician, social worker, occupational therapist, nutritionist, psychiatric technician, recreational therapist, etc. Thus, the amicus curiae brief submitted by CASH/PCR espouses the view that the settlement agreement in *Richard S.* was never intended to replace or limit a resident's or authorized representative's fair hearing rights provided for under the Lanterman Act.

## C. The Administrative Fair Hearing Procedure

In contrast to the discretionary judicial procedure forged in the *Richard S.* litigation, the Lanterman Act guarantees an applicant for or recipient of services or his or her representative "who is dissatisfied with any decision or action of the service agency" the right to an administrative fair hearing. (§ 4710.5, subd. (a).) The statute also provides detailed provisions

for claimants who wish to attempt to resolve the issue through a voluntary informal meeting or through voluntary mediation before proceeding to an administrative fair hearing. (§§ 4710.5, subd. (a), 4710.6, subds. (a), (b), 4710.7, 4710.8, 4710.9, 4711.5.)

The recipient of services or his or her representative must make the request for a fair hearing in writing on a form provided by the service agency and direct the request to the director of the service agency within 30 days after notification of the disputed decision or action.[7] (§ 4710.5, subds. (a), (b), (d).) Upon receipt of a hearing request, the service agency director shall immediately provide notice of the claimant's rights in connection with the fair hearing. (§§ 4710.6, subd. (a), 4711.) An administrative fair hearing must be held within 50 days of receipt of the request for a fair hearing. (§ 4712, subd. (a).) If a good cause continuance is granted, for any of the five reasons enumerated in the statute, the granting of the continuance cannot extend the time period for rendering a final administrative decision beyond a 90-day period. (§ 4712, subd. (a).)

■ The DDS is required to "contract for the provision of independent hearing officers" to conduct the hearing. (§ 4712, subd. (b).) The hearing officer is required to have special training in the law applicable to the developmentally disabled and the services available to them and the law of administrative hearings. (§§ 4710.5, subd. (a), 4712, subd. (b).) The agency awarding the contract for independent hearing officers "shall biennially conduct, or cause to be conducted, an evaluation of the hearing officers who conduct" administrative fair hearings. (§ 4712, subd. (n).)

At least five calendar days prior to the hearing, the claimant and the service agency shall exchange a list of potential witnesses, the subject matter of their testimony, and copies of documentary evidence. (§ 4712, subd. (d).) At the fair hearing, which "need not be conducted according to the technical rules of evidence," a claimant has "[t]he opportunity to be present in all proceedings and to present written and oral evidence"; "[t]he opportunity to confront and cross-examine witnesses"; "[t]he right to appear in person with counsel or other representatives of his or her own choosing"; "[t]he right to an interpreter"; and "[t]he right to access to records." (§§ 4712, subd. (i), 4701, subd. (f).) Absent good cause, the service agency presents its witnesses and all other evidence first and then the claimant presents his or her case. (§ 4712, subd. (j).) A recording shall be made of the proceedings at public expense. (§ 4712, subd. (k).)

■ Within 10 working days of the fair hearing, the hearing officer must "render a written decision" containing "a summary of the facts, a statement of

---

[7] Section 4704 defines "service agency" as "any developmental center or regional center that receives state funds to provide services to persons with developmental disabilities."

the evidence from the proceedings that was relied upon, a decision on each of the issues presented, and an identification of the statutes, regulations, and policies supporting the decision." (§ 4712.5, subds. (a), (b).) The hearing officer must "transmit the decision to each party and to the director of the responsible state agency" and notify them "this is the final administrative decision, that each party shall be bound thereby, and that either party may appeal the decision to a court of competent jurisdiction within 90 days of the receiving notice of the final decision." (§ 4712.5, subd. (a).) An appeal "shall not operate as a stay of enforcement of the final administrative decision, provided that either party may seek a stay of enforcement from any court of competent jurisdiction." (§ 4715, subd. (c).)

### D. Impact of the *Richard S.* Settlement on Statutory Fair Hearing Rights

There is no doubt that NBRC prefers that disputes over community placement be resolved by the streamlined judicial proceeding crafted by the settling parties in *Richard S.* as opposed to the comprehensive and multifaceted administrative procedure crafted by the Legislature pursuant to the Lanterman Act. Joined by numerous amici curiae, NBRC attempts to convince this court that direct access to the courts holds a number of advantages for resolving community placement disputes and that this case should be resolved simply by allowing the substitution of findings made at the judicial hearing conducted pursuant to *Richard S.* for those that should have been made at an administrative fair hearing conducted under the Lanterman Act.

Maldonado, on the other hand, argues that we "are not free to ignore the statutory procedure . . . or to adopt the procedure created by a private settlement of the *Richard S.* case." In light of the statutory scheme, Maldonado claims that "superior courts have no jurisdiction to review conservators' objections to community placement decisions in the first instance. Instead, the Legislature has directed review by administrative fair hearing. (§§ 4710–4715.)"

Maldonado has the better argument. We will not permit the substitution of a judicial hearing conducted in accordance with *Richard S.* to resolve Maldonado's objection to Whitley's community placement instead of the administrative fair hearing remedy provided to her in the Lanterman Act. Two distinct, but equally important reasons, support this conclusion: (1) Maldonado was not a party to the *Richard S.* settlement and it is not binding on her; and (2) the remedy provided for in the Lanterman Act is exclusive and jurisdictional.

In their supplemental briefs, the parties concede that Maldonado was not a named party to the *Richard S.* settlement and none of the named parties

to the *Richard S.* settlement purported to enter into the settlement in a representative capacity on behalf of anyone else. It is axiomatic that "[a] judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings." (*Martin v. Wilks* (1989) 490 U.S. 755, 762 [104 L.Ed.2d 835, 109 S.Ct. 2180], fn. omitted; see also *Estate of Baum* (1989) 209 Cal.App.3d 744, 749 [257 Cal.Rptr. 566] [settlement agreement, achieved by compromise, " 'can only affect the rights of the parties thereto or those in privity with them.' "].)

The privity exception constitutes a recognition that "in certain limited circumstances, a person, although not a party, [may have] his interests adequately represented by someone with the same interests who is a party. [Citations.]" (*Martin v. Wilks, supra,* 490 U.S. at p. 762, fn. 2.) However, in the latest round of supplemental briefing, the NBRC makes no attempt to demonstrate that Maldonado had " ' "an identity or community of interest with, and adequate representation by, [any] party" ' " in the *Richard S.* case so that she would " ' "reasonably have expected to be bound by the prior adjudication." ' " (*Citizens for Open Access etc. Tide, Inc. v. Seadrift Assn.* (1998) 60 Cal.App.4th 1053, 1070 [71 Cal.Rptr.2d 77].) In fact, NBRC candidly admits that "[b]ecause she was never a party to the litigation, Ms. Maldonado is *not legally bound* by the terms of the [*Richard S.*] settlement." (Italics added.)

■ Nevertheless, NBRC argues that, even though Maldonado was not bound by the *Richard S.* settlement, she "is an intended beneficiary" of the settlement and that "consistent with the intent of the parties to the *Richard S.* settlement, operation of the *Richard S.* procedures provided her with a full opportunity" to litigate her objections to Whitley's planned community placement. Although NBRC obviously attaches no legal significance to the nonbinding effect of the *Richard S.* settlement on individuals such as Maldonado, the importance of this concession is difficult to avoid. (*Martin v. Wilks, supra,* 490 U.S. at p. 763 [" 'a person not a privy may rest assured that [the] judgment . . . will not affect his legal rights.' "].) Accordingly, NBRC possessed no power to restrict Maldonado's statutory rights under the Lanterman Act merely by pointing to language in a settlement agreement, to which she was not a party and by which she is not bound, purporting to establish a judicial procedure for registering her objection to Whitley's proposed community placement.

We believe that the comprehensive approach to resolving disagreements concerning "consumer" placements, encompassing a wide variety of methods—including a voluntary informal meeting, voluntary mediation, and an administrative fair hearing with judicial review—clearly manifests the Legislature's intent that the Lanterman Act's fair hearing procedures be the

exclusive remedy for actions by legal representatives, such as Maldonado, asserting an objection to a community placement decision. (See *Rojo v. Kliger* (1990) 52 Cal.3d 65, 79 [276 Cal.Rptr. 130, 801 P.2d 373] ["As a general rule, where a statute creates a right that did not exist at common law and provides a comprehensive and detailed remedial scheme for its enforcement, the statutory remedy is exclusive."].)

This determination of exclusivity is not only supported by the comprehensive statutory scheme but by language found in the Lanterman Act itself, expressly making fair hearings the exclusive remedy for issues relating to the provision of services. Thus, section 4706, subdivision (a) provides that fair hearings are to be used to decide "*all issues* concerning the rights of persons with developmental disabilities to receive services under [the Act]." (Italics added.) More precisely, section 4803 states: "Objections to proposed [community] placements *shall* be resolved by a fair hearing procedure pursuant to Section 4700." (Italics added.) When used in a statute, "shall" has been found to have "a peremptory meaning, and it is generally imperative or mandatory." (*Shealor v. City of Lodi* (1944) 23 Cal.2d 647, 656 [145 P.2d 574] (dis. opn. of Curtis, J.).)

It is well settled that if an administrative remedy is provided by statute, relief must be sought from the administrative body and such remedy must be exhausted before judicial review of the administrative action is available. (*Ralph's Chrysler-Plymouth v. New Car Dealers Policy & Appeals Bd.* (1973) 8 Cal.3d 792, 794 [106 Cal.Rptr. 169, 505 P.2d 1009], and cases therein cited.) Stated otherwise, "exhaustion of the administrative remedy is a jurisdictional prerequisite to resort to the courts." (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 293 [109 P.2d 942]; see *Styne v. Stevens* (2001) 26 Cal.4th 42, 56 [109 Cal.Rptr.2d 14, 26 P.3d 343].) Until the administrative procedure has been invoked and completed, there is nothing that the trial court may do.

The exhaustion doctrine serves several well-established functions. First, the administrative remedy provides an opportunity to redress the alleged wrong without resorting to costly litigation. (*Sierra Club v. San Joaquin Local Agency Formation Com.* (1999) 21 Cal.4th 489, 501 [87 Cal.Rptr.2d 702, 981 P.2d 543] (*Sierra Club*).) Second, even where complete relief is not obtained, it can serve to reduce the scope of the litigation or possibly avoid litigation. (*Ibid.*; *Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465, 476 [131 Cal.Rptr. 90, 551 P.2d 410] (*Westlake*).) Third, an administrative remedy ordinarily provides a more economical and less formal forum to resolve disputes. (*Westlake, supra,* at p. 476; see also *Rojo v. Kliger, supra,* 52 Cal.3d at p. 83.) Finally, the exhaustion requirement promotes the development of a more complete factual record, allowing the administrative

decision maker an opportunity to apply his or her expertise, both of which assist later judicial review if necessary. (*Sierra Club, supra,* at p. 501; *Westlake, supra,* at p. 476.)

 When viewed in the light of the doctrine of exhaustion of administrative remedies, the conclusion is inescapable that the superior court lacked jurisdiction to conduct a *Richard S.* hearing on the propriety of Whitley's community placement. We emphasize that this rule is not a matter of judicial discretion, it is a matter of jurisdiction. " 'The administrative tribunal is created by law to adjudicate the issue sought to be presented to the court. The claim or "cause of action" is within the special jurisdiction of the administrative tribunal, and the courts may act only to *review* the final administrative determination. If a court allowed a suit to be maintained prior to such final determination, it would be interfering with the subject matter jurisdiction of another tribunal. Accordingly, the exhaustion of an administrative remedy has been held *jurisdictional* in California.' [Citations.]" (*Lopez v. Civil Service Com.* (1991) 232 Cal.App.3d 307, 311 [283 Cal.Rptr. 447]; see *Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 321 [25 Cal.Rptr.3d 320, 106 P.3d 976]; *California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1151 [43 Cal.Rptr.2d 693, 899 P.2d 79]; *Sierra Club, supra,* 21 Cal.4th 489, 495–496.)[8]

### E. Waiver of Administrative Fair Hearing Rights

The NBRC alternatively claims that even if Maldonado retained fair hearing rights under the Lanterman Act, she waived those rights when she submitted her request for a *Richard S.* hearing, and by not objecting to the later dismissal of her request for an administrative hearing. However, the NBRC overlooks that, in disregard of the mandate of the administrative fair hearing procedure set out in the Lanterman Act, Maldonado was instructed by NBRC that a *Richard S.* hearing in the superior court was the appropriate forum for her to raise her disagreement with the decision to place Whitley at Miracle Lane. Furthermore, the Office of Administrative Hearings ultimately dismissed Maldonado's request for an administrative fair hearing under the Lanterman Act based on NBRC's argument that the matter had been resolved by the *Richard S.* hearing in the superior court.

---

[8] Because we find the superior court lacked jurisdiction to review Maldonado's objection to the community placement decision in the first instance, we decline to consider numerous issues briefed by the parties, including whether the superior court applied an improper burden of proof, an erroneous standard of review and whether the court failed to consider whether the selected community facility was the most appropriate to meet Whitley's needs. We also need not decide whether Maldonado's exclusion from the June 9, 2005 planning meeting was prejudicial.

Maldonado has also submitted evidence that all of the Office of Administrative Hearings correspondence to her (the notice of the administrative hearing date, the letter requesting opposition to NBRC's motion to dismiss, and the decision dismissing Maldonado's fair hearing request) was never received because each piece of correspondence was misaddressed to the wrong post office box number. Under these circumstances, NBRC is estopped from arguing that Maldonado waived her administrative remedy. (See *Shuer v. County of San Diego* (2004) 117 Cal.App.4th 476, 486–487 [11 Cal.Rptr.3d 776].)

### F. Superior Court Jurisdiction under *In re Hop*

We consider one last argument. NBRC claims that our Supreme Court's opinion in *In re Hop* (1981) 29 Cal.3d 82 [171 Cal.Rptr. 721, 623 P.2d 282] (*Hop*) contains a clear directive creating ongoing jurisdiction in the superior court to hear challenges to community placement decisions in the first instance. Making a more refined argument, amicus curiae Protection & Advocacy, Inc. asserts that, under *Hop*, "issues concern[ing] Mr. Whitley's ongoing civil commitment" are "within the continuing and *exclusive* jurisdiction of the court." (Italics added.) Such reasoning is dubious and, in our view, *Hop* is of questionable application to these circumstances.

In *Hop* our Supreme Court considered whether a nondangerous developmentally disabled woman in need of state hospitalization, who was unable to provide informed consent, could be involuntarily admitted on a parent's application (§ 4825), without a judicial hearing. The court ruled that her admission was unconstitutional and that she was entitled to a "judicial hearing on . . . whether, because of developmental disability she is gravely disabled or a danger to herself or others and whether placement in a state hospital is warranted." (*Hop, supra*, 29 Cal.3d at p. 93.) Further, the court held she was entitled to the application of criminal due process standards, including the right to a jury trial, unanimous verdict, appointed counsel, and application of the standard of proof beyond a reasonable doubt. (*Id.* at pp. 93–94.)

We first point out that the exclusivity of the Lanterman Act's fair hearing procedure was not at issue in *Hop* nor did it address whether disputes with regard to community placement require the full panoply of due process rights accorded a criminal defendant. " '[A]ll that *Hop* held was that a developmentally disabled person initially committed by her mother under section 4825 is entitled to a judicial hearing to test the basis for the commitment.' [Citation.]" (*In re Violet C.* (1989) 213 Cal.App.3d 86, 94 [261 Cal.Rptr. 470].) By contrast, the question presented here is whether Whitley should remain at the SDC or be placed in a community placement at Miracle

Lane. The due process concerns for retention in a development center are not the same due process concerns that are present when a developmentally disabled individual is first involuntarily committed. (See *Cramer v. Gillermina R.* (1981) 125 Cal.App.3d 380, 393 [178 Cal.Rptr. 69] [holding that a full judicial adversarial hearing was not required before issuing an interim order to hold mentally retarded individuals pending a judicial recommitment hearing].)[9] Accordingly, the expansion of remedies beyond those provided in the fair hearing statute does not come as a natural evolution of *Hop*—it is in derogation of the express will of the Legislature in establishing a fair hearing procedure.

## G. Conclusion

NBRC devotes a significant amount of briefing assuring us that the superior court made the correct decision in upholding the decision to place Whitley in a community facility, and that Maldonado's objections to this placement are unfounded. Even if we agreed with NBRC's conclusion, an issue we do not resolve, we would still have no choice but to reverse this judgment.

 We must also resist amici curiae's call for us to adopt the streamlined procedure set out in the *Richard S.* settlement because it is far preferable to the "futile and time-consuming" remedy provided by the Legislature which could "delay the individual's move to the community indefinitely." Once again, even if we agreed that immediate judicial access for all of these parties might be desirable, the Legislature, in promulgating the fair hearing procedures of the Lanterman Act, has struck a different balance, requiring that administrative remedies be exhausted before judicial review takes place. Having made that determination, respect for the legislative prerogative in lawmaking requires that we not interfere with these enactments where disagreement is founded only on policy considerations and the legislative scheme employs reasonable means to effectuate a legitimate objective. Simply put, we may not craft a remedy where the Legislature intends no remedy to exist. If the administrative fair hearing procedure is not functioning in the best interest of the developmentally disabled, a legislative solution to correct the deficiencies should be pursued. We have " 'no power to rewrite the statute so as to make it conform to a presumed intention which is not

---

[9] We note that the fair hearing provisions of the Lanterman Act provide traditional due process safeguards to residents and their authorized representatives in the event there is a disagreement. A hearing is required; testimony and other evidence is received; witnesses are questioned and cross-examined; a verbatim record is made; a written opinion is issued; generalized standards to guide the exercise of the administrative law judge's power are stated, and the decision is subject to judicial review. We see no constitutional due process infirmity.

expressed.' [Citations.]" (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 633 [59 Cal.Rptr.2d 671, 927 P.2d 1175].)

## IV.

## DISPOSITION

We reverse the superior court's ruling and remand with instructions for the SDC and NBRC to proceed with a new IPP planning meeting, with Maldonado present, as required by the Lanterman Act. (§§ 4512, subd. (j), 4646.) If the IDT still recommends community placement, and Maldonado again disagrees with the community placement decision reached through a procedurally proper IPP process, she should be accorded her legislatively granted right of review through the administrative fair hearing process, and that afforded by the administrative mandamus review procedure.

Reardon, J., and Rivera, J., concurred.