[Civ. No. 24605. Fourth Dist., Div. One. July 24, 1981.]

In re ANDREW BORGOGNA on Habeas Corpus.

938

COUNSEL

Jerry Smilowitz for Petitioner.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Peter Quon, Jr., Jay M. Bloom and Lillian Lim Quon, Deputy Attorneys General, for Respondent.

## OPINION

**STANIFORTH, J.**—Harbor Regional Center for Developmentally Disabled Citizens, Inc. (Harbor), and the public defender, both purporting to act on behalf of Andrew Borgogna, a developmentally disabled person, filed a petition for writ of habeas corpus in Orange County Superior Court contending Andrew should be released from Fairview State Hospital, where he is a voluntary admittee, to a community placement under the auspices of Harbor. The petition was opposed by the director of Fairview, Dr. Francis Crinella, and by Andrew's mother and sister, Mrs. Borgogna and Mrs. Tiritilli. The public defender appointed to represent Andrew joined in the petition, but Andrew himself expressed opposition to the release. After holding an evidentiary hearing, the superior court declined to issue the writ. It found: first, the petition was not filed on Andrew's behalf because both he and his guardian opposed it, and Andrew, as found specifically by the court, is competent "to make such a decision"; and second, Harbor is not able to provide safely for Andrew's needs because of the risk of his suffering psychiatric regression should he be placed. The court said it would entertain other petitions in the future should Andrew's psychological situation change so as to show less danger in placing him outside the hospital.

■ We dismissed Harbor's appeal from the denial of the writ, which is not an appealable order or judgment. (Code Civ. Proc., § 904.1; *In re Hochberg* (1970) 2 Cal.3d 870 [87 Cal.Rptr. 681, 471 P.2d 1].) Harbor has since lodged this petition for habeas corpus here, asking us to command Fairview State Hospital to release Andrew from custody or alternatively to bring Andrew before the court to give the cause of his confinement, as well as for other appropriate relief. ■ In considering whether to issue the writ, we are not bound by the findings of the superior court but we must independently review and appraise the records and transcripts. (*In re Hochberg, supra*, 2 Cal.3d 870, 876-877; *In re Smiley* (1967) 66 Cal.2d 606, 611 et seq. [58 Cal.Rptr. 579, 427 P.2d 179]; *In re Atchley* (1957) 48 Cal.2d 408, 411 [310 Cal.Rptr. 15].)

■ We deal here with recently enacted provisions of the Welfare and Institutions Code[1] which establish certain rights of the so-called developmentally disabled persons, primarily their entitlement to the maximum degree of personal liberty and autonomy consonant with their

---

[1]All references are to the Welfare and Institutions Code unless otherwise specified.

handicap. (See, e.g., §§ 4501-4503, 4750, 4800 et seq.; *In re Hop* (1981). 29 Cal.3d 82 [171 Cal.Rptr. 721, 623 P.2d 282].) The legislative mandate directs, therefore, such persons be situated in the least restrictive placement possible. (*In re Hop, supra*, 29 Cal.3d at p. 93, citing, e.g., §§ 4418.5, 4502, 6509.) ■ To implement this goal, the statutes create entities known as regional centers, such as Harbor here, which have the primary responsibility to locate community placements for developmentally disabled persons. These centers must, with respect to persons already admitted to state hospitals, such as Andrew, screen the records of all such admittees to determine whether less restrictive placements are possible; and with respect to prospective new admissions of such persons to state hospitals, the centers must consider alternative placements first. (See §§ 4500-4509, 4648, 4652, 4653.) No developmentally disabled person may be admitted to a state hospital "except upon the referral of a regional center." (§ 4653.) The legislative intent stated for this statutory scheme is that developmentally disabled persons may lead more "independent, productive, and normal lives." (§ 4750.)

Andrew, now age 45, was committed to Fairview at the age of 20 when none of the foregoing legislation existed and the opportunities for community placement were rare. He has been a Fairview patient for more than 20 years. He was originally placed in the hospital by his mother and sister who have, however, continued to visit him and take him home regularly and who have a close and loving relationship with him. According to all testimony, he is one of the "highest functioning" patients at the hospital; that is to say, his abilities and intelligence are relatively high in the comparable hospital population. He now resides in a so-called transition project on the hospital grounds which is designed to facilitate transition, as its name suggests, to the outside world. He works every day at a school, has the freedom of the hospital grounds, takes care of his personal needs and makes small purchases at the canteen there. He expresses to all witnesses, and also by his own testimony in this proceeding, contentment with his situation in the project, but he also shows fear of leaving that situation; or in other words, he is happy with the living conditions, but the transitional nature of the placement worries him. According to the testimony of Dr. Crinella, Andrew is fully aware of the legal efforts to remove him to a community placement and has responded by certain regressive behaviors and exhibitions of anxiety. Also according to Dr. Crinella and confirmed by the testimony of his sister, Andrew has known no other home but Fairview for so long that his removal at this point to a community placement would threaten

his psychological stability and could cause temper tantrums, regression and even a possible psychotic breakdown.

Members of the Fairview staff responsible for Andrew and also the client program coordinator at Harbor (Herrick) testified, however, Andrew's resistance to a placement is largely the product of his family's opposition. They pointed out the family opposed his placement in the transition project also. Andrew himself resisted that change, but once it was accomplished, he adjusted relatively quickly and has improved his skills by living there with greater opportunity for excursions into the community and contact with higher functioning peers and normal persons. They also testified many persons have been placed who are much lower functioning than Andrew, and he is indisputably sufficiently competent to do well outside the hospital. Herrick testified she has located at least one suitable facility for Andrew, Toni Long's Board and Care Home in Cypress, where she is certain he would do well. A van could come there and take him to the school where he now works and center staff could monitor his progress. She testified Andrew is number one on her list of 132 Fairview patients eligible for placement. She stated he is resistant to change and fears the unknown, but this fear could be gradually overcome by familiarizing him with the placement home before moving him there and following up to make sure his adjustment was satisfactory. It was pointed out, however, that no statute requires either the center or Fairview to monitor the placement, either during the first six months—which are provisional (§ 4508)—or afterward—when Andrew's status as an admittee of Fairview would expire and he would have no automatic right of readmission.

The testimony showed Andrew has been regarded as a suitable placement candidate since 1968, but his family has opposed his transfer. His sister testified she and the mother oppose the transfer because they honestly believe it would make Andrew unhappy and would not be in his best interests. Her fears included a worry his skills might be insufficient to protect him; for example, he cannot cross streets unassisted or dial a telephone, and he might be in a situation where the supervision at the home was inadequate or the staff there was not as responsive to his needs as would be the better trained staff at the hospital. Further, Andrew now has complete freedom on the hospital grounds because he is familiar with them and can be trusted there, but he could not enjoy that level of freedom out in the community because of his inability to appreciate various dangers, mainly traffic. If he were unhappy or mistreated at the home, or if an emergency arose such as the sudden death of the

one resident caretaker, Andrew might not be able to get help. Further, she testified the staff at Fairview are Andrew's friends and are more important to him than his peers, thus disputing the contention he must be transferred in order to be exposed to higher functioning peers than now remain in Fairview. She pointed out she and her mother have Andrew regularly to visit in their home, but after he is there a few days, he invariably becomes restless and wants to return to the hospital. Further, when she takes him out, shopping or other excursions, he is not always watchful for cars and must be carefully supervised. She also testified he is not completely happy at the transition project but only because of its provisional nature, and that he would be perfectly content there, as he was previously when on a ward, if he could be assured he has a permanent home at Fairview. Most important, as her reason for opposing placement, she testified she loves her brother but does not "rule him"; she honestly believes he does not want to be placed and she believes his wishes should be respected.

Her testimony was essentially corroborated by Dr. Crinella, present head of the hospital, who testified he has had extensive contact with Andrew over the years and considers him a friend and a peer. He has had him to dinner at his home frequently. Crinella gave the opinion Andrew has spent half his life in the hospital; he had to make a difficult transition initially when he was first admitted, and he is not able at the age of 45 to do that again. Further, he testified Andrew and his family are an "inextricable social unit" linked together and affecting each other inevitably, but that does not mean, in his opinion, the mother and sister are "pressuring" Andrew but rather indicates he has a natural desire to please them. As stated, Dr. Crinella believes a placement now could trigger serious psychotic regression.

Crinella also testified Fairview is now acquiring funds for a project to construct condominium apartments on the grounds for the clients as well as for persons in the community who qualify on the basis of need for affordable housing. In that project Andrew might be able to live semi-independently. It would be preferable to a community placement because he would still have regular hospital access to the staff members he knows and trusts and who are more competent to supervise his welfare than the less well-trained proprietors of private board and care establishments.

Finally, Crinella testified Andrew is entirely competent to make a decision about his living situation.

The witnesses for Harbor, however, all testified Andrew is dominated by his family and will not give an opinion contrary to their wishes. They believe the family is unreasonably opposing the placement, and because of their attitude, Andrew also opposes it. They also believe that Andrew will adjust to a placement once it is effected as he did when moved to the transition project. They further testified the Long home is a "lovely" place and that the sister's fears are unjustified. Addressing her particular concern that the home might go out of business after she and her mother were gone, Herrick testified the center would find another placement for Andrew. In argument it was also urged Fairview may not last forever either. Ultimately all these institutions, including Harbor, are dependent on public funds.

Andrew testified, with all witnesses excluded, he wants to stay at Fairview.

An argument advanced also for the placement was, under the new legislation, persons as advanced as Andrew are all being placed in the community. Soon only low functioning persons will be left at Fairview and Andrew will regress in such company. In aid of this argument, the parties have offered in evidence to this court a declaration which was not before the trial court, prepared March 26, 1981, by Linda J. Allen, the client's rights advocate at Fairview. The document states all Andrew's peers have been placed, and he is the highest functioning client at Fairview. He has said "I'm never going to get out of here," and has referred to incoming patients as "low grade." His sociability has decreased with the change in client population. The declaration does not discuss the sister's comment that Andrew relates better to staff members than fellow patients.

Another psychiatrist, Dr. Anderson, appointed by the court, examined and interviewed Andrew. He gave the opinion Andrew could be placed in the community, not immediately, but soon, with transition procedures implemented as soon as possible. He felt anxiety might develop but could be "worked through" to a successful placement. He further believed Andrew's close relationship with his family causes him automatically to absorb their attitudes, and this is the source of his resistance to placement. The staff must create a stronger rapport with Andrew than he has with his family in order to overcome this resistance, a difficult but not impossible task. Then placement would become feasible. Dr. Anderson actually agreed with Dr. Crinella that Andrew should not be placed immediately, but he did think placement

should be made in a much earlier time frame, with implementing steps to begin now, such as exposure to a number of placements and supportive therapy. Dr. Crinella, on the other hand, believed it would be better to wait until the apartment project was completed and then effect a transition there. Also, Dr. Crinella believed psychotic regression might occur upon immediate placement and also described Andrew as a "simple schizophrenic," but Dr. Anderson disagreed with the former opinion and found the latter phrase meaningless and not applicable.

Regional centers are statutorily created entities to be operated by private nonprofit community agencies as agents of the state to provide community contacts for developmentally disabled persons and their families. (§ 4620.) The statutes regulate them extensively. (§§ 4620-4637.) They are charged with responsibility for both new admissions and present state hospital admittees who are developmentally disabled and in both cases must consider and recommend placement alternatives. (§§ 4509, 4646, 4648, 4653.) There is further provided a fair hearing grievance procedure (§ 4705 et seq.) in which: "If in the opinion of any person, the rights or best interests of any individual with developmental disabilities may not be properly protected or advocated in any appeals procedure, the area board shall be notified and the area board may appoint a personal advocate to represent the individual with the developmental disability in such appeals procedures." (§ 4718.) Placements are subject to review by writ of habeas corpus (§ 4800 et seq.) if the ward or "any person acting on his behalf [makes a] request for release." (§ 4800.) Where the ward is not competent to request such a petition, the public defender has standing to make it on behalf of the ward. (*In re Hop, supra*, 29 Cal.3d 82.) Finally, "any adult person with a developmental disability has the legal right to determine where his or her residence will be." (§ 4741.) The latter statute also states unless there is immediate danger to health and well being, a client shall not be removed from a residential care facility against his or her wishes without specific court action.

To these requirements is added the further mandate of *In re Hop, supra*, that when placement is escalated to a state hospital, the developmentally disabled ward is entitled to an automatic judicial review of the transfer, with the same rights as conservatees under the Lanterman-Petris-Short Act, including the right to jury trial and to proof beyond a reasonable doubt on the issue of the existence of dangerous mental condition. (*In re Hop, supra*, 29 Cal.3d 82, 93.)

The foregoing statutory scheme, and the one relevant case, *In re Hop, supra*, are addressed to problems which may arise when a developmentally disabled person is placed in a more restrictive setting than he formerly was held in, either expressly against his wishes or possibly against his best interests. They do not address directly the issue we have here where the center seeks to deescalate or make less restrictive the placement, but the ward opposes such a transfer. Thus in *Hop* the ward had been removed from a community home to the hospital. Similarly the statute authorizing habeas corpus review, section 4800, refers to a "request for release," not a request to stay in the same facility. Also, section 4741, *supra*, articulating the right of the ward to determine where his residence will be (assuming competence to do so), prevents removal from a residential care facility without court action, but does not address removal from a state hospital. Throughout, the assumption is that the most restrictive and undesirable custody is in a hospital and that the ward, or those most interested in his welfare, will be opposing that placement. Here, however, the ward and those closest to him take the opposite position and advocate retention in the hospital, while Harbor, which has the primary statutory responsibility to determine the appropriate placement, advocates community placement.

■ A preliminary word about standing and burden of proof is appropriate. Inasmuch as the statutes discussed above plainly vest the decision whether to make a community placement in Harbor and give Harbor continuing responsibility to oversee the ward's welfare, both in choice of placement and in initial decision of referral, Harbor plainly has standing to petition the superior court to enforce its decision regarding such placement. Although this is not the precise holding of *In re Hop, supra*, which merely established the public defender's right to advocate on behalf of the ward without her consent, nevertheless *Hop* implies, at least in situations where the ward is not clearly competent to speak for himself, others may do so and are fully authorized to be heard. The superior court here therefore correctly permitted Harbor to appear and be heard as a party in the habeas corpus procedure, and it has standing here as well.

Similarly, since the responsibility is Harbor's to make the placement decision, clearly the Legislature intended its decision to be effective unless it could be clearly demonstrated to be erroneous. ■ Accordingly, as we view it, the burden of proof rests on the parties opposing Harbor's recommendation to establish that the recommendation should not be honored. ■ The trial court here did not articulate the burden

of proof standard which it used but rather stated it followed the rule of the "Buchanan" case that the best interest of Mr. Borgogna is the criterion. The case referred to, however (*Conservatorship of Buchanan* (1978) 78 Cal.App.3d 281 [144 Cal.Rptr. 241]), is not relevant. It deals with involuntary commitment of the mentally disordered and does not establish any doctrine regarding the burden of proof in this, or any analogous, case. Thus the trial court was apparently confused about the correct approach to this hearing.

Its confusion, however, has not necessarily produced error. The crucial finding here is whether Andrew is competent to decide for himself where he shall live. The statutes we have cited all reinforce the concept of maximizing the personal liberty and dignity of the ward by, among other things, permitting him as much freedom of choice as is consonant with his disability. As stated, he is specifically given the right to choose his residence. (§ 4741.) Here, Andrew has chosen to stay at Fairview. If there is substantial evidence to show his competence to make that choice, then we believe the trial court was correct in honoring it. We reach this conclusion despite the fact of Harbor's primary responsibility regarding placement choice, because in light of the many statutory references to the goal of maximum autonomy for the ward, we believe the Legislature intended his choice to be the first consideration if he is competent to choose. Of course, the ward's choice must be consistent with the available opportunities. If here the Fairview administration had refused to keep him as a client, then a different issue might be presented; but we think where the hospital director is not only willing to keep the ward, but in fact testifies strongly in favor of that option, and where the ward himself chooses to remain, then his choice should be respected, provided, as stated, there is sufficient evidence to support the finding he is competent.

In considering the evidence in this record, we note a striking contrast: the testimony of the witnesses for Harbor is mostly concerned with abstract goals, of normalization, growth and stimulation of the ward, a continuing learning process to bring him into a hypothetical community; but the testimony of Dr. Crinella and of Andrew's sister opposing the transfer is mostly concerned with Andrew. Both Dr. Crinella and the sister focused most directly on Andrew's feelings, his needs, the difficulty and new trauma which a transfer would inevitably cause him. They were unwilling to see him undergo this shock and were skeptical about the possible benefits which the Harbor witnesses described. Their

testimony implied a strong belief that at age 45, after more than 20 years in the hospital, Andrew was no longer in a position to take advantage of the same possibilities as might have been suitable when he was younger, and that it would be cruel at this point to force him to do so. Their sentiments were, of course, mirrored in Andrew's resistance to the transfer. It is not possible to ascertain whether his resistance is but the reflection of the hesitation of his loved ones, or whether it represents his own accurate estimate of his inability to make the change, which feeling in turn his loved ones wish to respect.

The trial court's finding of competence rests on Dr. Crinella's thrice repeated testimony to that effect. It seems clear the trial court believed him because it was impressed, not only with his academic credentials, but with his obvious concern for Andrew, the individual. The following testimony of Dr. Crinella is indicative, and persuasive: "The benefits [of community placement]...are abstract in that they conform to an ideal about lesser restrictiveness that has been held by some people in some quarters to be more ideal than apartments which would be within the shadows of the state hospital. Aside from that I see in most community placements tremendous disadvantages in comparison to the units that we are developing ... because we'll have backup staffing available, because we will be assisting the people who develop these units in becoming better managers, better clinicians, and because ... I see Andrew daily. Sometimes several times a day. I speak with him several times a week. At least two or three times a month I have an extended conversation with Andrew. Andrew has eaten dinner and coffee and visited in my home which is four doors down the street. He and my five children know each other well. He's especially friendly and fond of my wife, and I consider Andrew my personal peer and friend.... I would go along with Andrew's wishes, yes. Unless I were of the opinion that he is incompetent in expressing those wishes. And, I've already stated in direct that I do not feel he is incompetent in making those statements.... I don't feel he is so institutionalized that he cannot make a perfectly competent statement about what currently makes him happy in the way of a living arrangement.

"      .      .      .      .      .      .      .      .      .      .      .      .      .

"Q. Dr. Crinella, would you anticipate any permanent harm to Andrew if he were given an opportunity to try a community placement for a period of time?

"A. Yes, I would. . . . Andrew could have a psychotic break and Andrew could be irreparably psychologically damaged by an experiment of that sort. . . . [T]here might be a dearth of clinical expertise available to him to deal with his situation and to assist him in recovering and compensating. . . . He might permanently decompensate during those six months [of temporary placement] and then we would take Andrew back and have him for sure for the rest of his life."

We conclude from this testimony, as did the trial court, that Andrew is competent to choose to remain at Fairview. Our finding does not violate the legislative intent favoring community placement. That laudable intent should be effectuated whenever possible, but in the case of long-term hospital residents like Andrew, it may not be humanely possible. Further, the legislative intent to maximize the personal autonomy and dignity of the developmentally disabled would be violated here by a transfer against Andrew's wishes. Even for developmentally disabled persons, there may come a time when they are entitled to be treated as adults with respect for their decisions, with some measure of personal control over their lives. There may come a point where they are to be no longer regarded as children to be made to do what is good for them regardless of their feelings. Here we have a 45-year-old man who, according to those closest to him, is competent to decide where he should live. The effort of painful transition, regardless of potential benefit, is more than he can face. We agree with the trial court it will best serve Andrew's interests to let him be.

Accordingly, the petition for writ of habeas corpus is denied.

Brown (Gerald), P. J., and Cologne, J., concurred.

The petitions of both parties for a hearing by the Supreme Court were denied August 19, 1981. Richardson, J., was of the opinion that the respondent's petition should be granted.