[No. H034209. Sixth Dist. June 22, 2010.]

In re MICHAEL K. on Habeas Corpus.

**COUNSEL**

Monica B. Wegner and Randall Riccardo for Appellants James K. and Gail B.

Jean F. Matulis, under appointment by the Court of Appeal, for Respondent Michael K.

**OPINION**

**PREMO, J.**—In 2005, the Legislature approved a plan to close Agnews State Hospital (Agnews). As part of the closure plan, it passed Senate Bill No. 962 (2005–2006 Reg. Sess.), which was signed by the Governor and enacted into law on October 5, 2005. The Welfare and Institutions Code, as amended by Senate Bill No. 962, authorizes the State Department of Developmental Services (DDS) and the State Department of Social Services (DSS) to jointly establish and administer a pilot project for licensing and regulating adult residential facilities for persons with special health care needs, known as a Senate Bill No. 962 Home (hereafter Senate Bill No. 962 Home).[1] Senate Bill No. 962 Homes are residences that can accommodate four to five individuals with significant developmental disabilities in a community setting.

Michael K. (hereafter referred to as Michael for clarity) is a gravely disabled adult who has resided at Agnews since 1986. Gail B. and James K. (hereafter referred to as Gail and James for clarity) are his parents and coconservators. When the Legislature approved the plan to close Agnews, San Andreas Regional Center (SARC) determined that Michael would be placed in a Senate Bill No. 962 Home.[2] Gail and James objected because they wished Michael to be placed in Sonoma Developmental Center

---

[1] DDS administers and oversees programs relating to persons with developmental disabilities and state hospitals. DSS licenses and regulates community care and residential facilities.

[2] California contracts with private nonprofit corporations to establish and operate a network of 21 regional centers "for determining eligibility, assessing needs and coordinating and delivering direct services to individuals with developmental disabilities and their families within a defined geographical area." (*Capitol People First v. State Dept. of Developmental Services* (2007) 155 Cal.App.4th 676, 682–683 [66 Cal.Rptr.3d 300].)

(Sonoma). In 2008, an administrative law judge upheld the objection and ordered SARC to place Michael in Sonoma. But in 2009, the public defender, purporting to act on behalf of Michael[3] and under the authority of *In re Hop* (1981) 29 Cal.3d 82 [171 Cal.Rptr. 721, 623 P.2d 282] (*Hop*), filed a petition for a writ of habeas corpus contending that Michael should be placed in the Senate Bill No. 962 Home. Gail and James appeared and objected. SARC appeared and asked for a court order for Michael's placement. The trial court granted the petition. On appeal, Gail and James contend that the trial court failed to give deference to the administrative decision. Michael, represented by court-appointed counsel, counters that substantial evidence supports the trial court's order. SARC has made no appearance on appeal. We agree with Gail and James. We therefore reverse the order.

## LEGAL BACKGROUND

■ The Lanterman Developmental Disabilities Services Act (Lanterman Act) (Welf. & Inst. Code, § 4500 et seq.)[4] "grants persons with developmental disabilities the right to receive treatment and services to meet their needs, regardless of age or degree of handicap, at each stage of life. These individuals are 'consumers' of the treatment and services they receive. [Citation.] The state must pay for these services through contracts with various private nonprofit corporations for the operation of regional centers for the developmentally disabled, such as [SARC], and requires regional centers to develop an IPP [individual program plan] for each consumer that sets forth the treatment and services to be provided for the consumer." (*Conservatorship of Whitley* (2007) 155 Cal.App.4th 1447, 1454, fn. 3 [66 Cal.Rptr.3d 808] (*Whitley*).)

■ The Legislature enacted the Lanterman Act to "establish certain rights of the so-called developmentally disabled persons, primarily their entitlement to the maximum degree of personal liberty and autonomy consonant with their handicap. [Citations.] The legislative mandate directs, therefore, such persons be situated in the least restrictive placement possible. [Citation.] To implement this goal, the statutes create entities known as regional centers, such as [SARC] here, which have the primary responsibility to locate community placements for developmentally disabled persons. These centers must, with respect to persons already admitted to state hospitals, such as

---

[3] Neither Michael nor his coconservators consented to the public defender's representation.

[4] Further unspecified statutory references are to the Welfare and Institutions Code.

[Michael], screen the records of all such admittees to determine whether less restrictive placements are possible; and with respect to prospective new admissions of such persons to state hospitals, the centers must consider alternative placements first. [Citations.] No developmentally disabled person may be admitted to a state hospital 'except upon the referral of a regional center.' [Citation.] The legislative intent stated for this statutory scheme is that developmentally disabled persons may lead more 'independent, productive, and normal lives.' " (*In re Borgogna* (1981) 121 Cal.App.3d 937, 940–941 [175 Cal.Rptr. 588].)

■ The Probate Code provides for the appointment of a conservator of the person for "a person who is unable to provide properly for his or her personal needs" (Prob. Code, § 1801, subd. (a)) or a conservator of the estate "for a person who is substantially unable to manage his or her own financial resources or resist fraud or undue influence" (*id.*, subd. (b)). Generally, a Probate Code conservator has the care, custody, and control of the conservatee and is empowered to fix the residence of the conservatee anywhere in the state and make health care decisions if the conservatee has been adjudicated to lack the capacity to make health care decisions. (*Id.*, §§ 2351, 2352, 2355.)

■ The Probate Code additionally provides for the appointment of a "limited conservator" of the person, estate, or both "for a developmentally disabled adult." (Prob. Code, § 1801, subd. (d).) "The limited conservator shall secure for the limited conservatee those habilitation or treatment, training, education, medical and psychological services, and social and vocational opportunity as appropriate and as will assist the limited conservatee in the development of maximum self-reliance and independence." (*Id.*, § 2351.5, subd. (a)(2).) But a limited conservator is not empowered absent court order to fix the residence of the limited conservatee or give medical consent. (*Id.*, subd. (b).)[5]

■ "The Legislature, in relevant provisions of the [Lanterman Act] . . . details the rights and relief available to . . . legal representative[s], such as [Gail and James] acting as [Michael's] [co]conservator[s], who believe[] a placement decision has been proposed that is not in [their] conservatee's best interests. Those statutory provisions direct that a legal representative's objection to a proposed community placement is to be resolved by an

---

[5] The record does not show when Gail and James became Michael's coconservators or whether they are Probate Code coconservators or Probate Code limited coconservators.

administrative fair hearing procedure followed by superior court review if the conservator, or another party, remains dissatisfied with the result." (*Whitley, supra*, 155 Cal.App.4th at p. 1453, citation & fn. omitted.)

## FACTUAL BACKGROUND

We appreciate Administrative Law Judge Karen J. Brandt's comprehensive decision and adopt from it as indicated by unattributed quotation marks.

Michael was born prematurely in 1976 and has lived at Agnews since 1986. He is a person with profound mental retardation, with an IQ of 10. He has serious medical complications arising from his premature birth such as a paralysis of all four limbs, a disordered muscle tone, the sufferance of seizures, the inability to use or understand language, the required feeding through a jejunostomy tube (J tube), incontinence, reactive airway disease, constipation, hypertension, bone loss, scoliosis in the spine, and hip and pelvic deformity.

Michael "cannot walk or talk. He is legally blind, although he may have some light perception in his left visual field. He has normal to normal/borderline hearing. . . . [He] is 'gravely disabled.' Because of his profound mental retardation, he is not able to make a knowing and intelligent choice regarding his living placement. He is totally dependent on others for all his nursing care and daily needs. He has no independent living skills. The staff at Agnews provide[s] all his bathing, hygiene and toileting. He requires skilled nursing care on a 24-hour basis. He wears disposable briefs for bowel and bladder incontinence. He is confined to an adaptive wheelchair, which staff propel. He must be repositioned every two hours to prevent bedsores. He appears to be able to recognize his name. He responds by attempting to turn his head toward the source of the sound and, at times, will smile. He also appears to respond more readily to staff members who regularly work with him than he does to strangers. Due to his neurological deficits, his attention span is at a minimal level. He communicates his pleasure by smiling, and his discomfort or pain by crying and making facial grimaces. He appears to enjoy one-to-one attention, family members visiting with him, listening to music, and sensory stimulation.

"At Agnews, in addition to the 24-hour nursing care that he receives, [Michael] also participates in a number of leisure activities. He attends music activities daily, sensory stimulation five times a week, and storytime twice a

week. He also participates in rhythm/dance and outdoor activities. During these activities, he smiles, vocalizes, and turns toward the source of the stimuli. He appears to enjoy when his arm is touched gently, when his wheelchair is moved in rhythm to music, and when he is taken for walks outdoors. He also participates in Adult Services Programs. He has recently learned to hold an object in response to physical prompts. He is currently being trained to use a switch to activate leisure devices, such as a musical box or carousel bell. He goes to church twice a month and sometimes hums to the music. Although he receives all his feedings through his J tube, each day he is given a snack to taste and feel the sensation of food in his mouth."

The Legislature has enacted laws to facilitate the transition of Agnews's residents to Senate Bill No. 962 Homes. "Legislation has been enacted to allow for Agnews employees to work for SB 962 Homes to ensure that there will be continuity of care for the residents. Rules have been adopted that require that SB 962 Homes have licensed staff on premises at all times. Programs have been developed and are being implemented to ensure that the employees of the SB 962 Homes are properly trained to care for the significant medical, developmental, and personal needs of the residents. Regional centers are required to monitor the SB 962 Homes to ensure that they comply with all applicable laws and regulations governing the care of the developmentally disabled. A comprehensive planning team process has been instituted to assess the community living options available for each Agnews resident and to identify and provide for all the services and supports each resident will need."

"On August 17, 2007, a Special Conference was convened with [Michael's] Interdisciplinary Team (IDT)[6] to discuss the family's request that [Michael] be transferred to Sonoma, instead of a community home. During the conference, the family expressed its belief that Sonoma has the most direct and favorable comparison to Agnews in terms of full medical care. The family also stated that [Michael] would prefer living in Sonoma's dormitory setting, would be able to attend religious services with his peers, and would rejoin friends and caregivers at Sonoma. The family expressed concerns that, if claimant were transferred to a community home, he would have to travel to obtain occupational therapy and day programs, and he does not do well with such transitioning. The family was also concerned that [Michael] would have to travel out of

---

[6] "Under California law, the IDT is referred to as the 'planning team' and includes the consumer, his or her parents (or legally appointed guardian or conservator, as appropriate), the authorized representative, one or more regional center representatives, and any individual, including a service provider, invited by the consumer or his or her parents/conservator." (*Whitley, supra*, 155 Cal.App.4th at p. 1454, fn. 2.)

the home to get medical treatment. In addition, the family was worried that community care homes were only required to have a doctor visit every 60 days, while a developmental center[7] provides daily visits by physicians. A SARC representative explained that an assessment had been completed, which showed that an SB 962 Home could provide the level of care [Michael] required. The family was informed of the scope of services that the SB 962 Home could provide, the training that would be given to the SB 962 home staff, and the services that Agnews doctors and outpatient clinic would offer to ensure continuity of care. [¶] After all members of the IDT were given an opportunity to present their positions, a majority of the team agreed that a referral packet for [Michael] would be forwarded to Sonoma for review. SARC did not, however, agree to the referral and believed that [Michael] could be well served in an SB 962 Home."

Sonoma received the packet and, for unexplained reasons, understood that the IDT (interdisciplinary team) was continuing its discussions regarding Michael's options. It replied that it would hold the packet in abeyance pending further action by the IDT. The IDT, in turn, convened again because it understood that Sonoma had required further exploration of local resources before it would consider the package. At the conference, SARC said that it would not transfer Michael to Sonoma because Sonoma was not the least restrictive environment for Michael. Gail and James then invoked the fair hearing administrative procedure to appeal from SARC's decision and an administrative case was opened under the title "M.K., Claimant, vs. San Andreas Regional Center, Service Agency."

At the hearing on December 11, 2008, SARC argued that Sonoma was not the least restrictive environment for Michael. It pointed out that, unlike a Senate Bill No. 962 Home, Sonoma was a locked facility where Michael would not be free to leave on his own. It urged that, unlike a Senate Bill No. 962 Home, Sonoma was isolated from the local community. And it opined that a Senate Bill No. 962 Home "provides nicer accommodations" because it is a homelike setting providing a private bedroom and semiprivate bathroom.

Judge Brandt discounted these arguments by making the points that Michael is physically incapable of leaving a facility, locked or not, and would not be able to appreciate the local community or accommodations of a Senate Bill No. 962 Home, given the severity of his disabilities.

---

[7] Our state mental hospitals are euphemistically called "developmental centers." (*In re Violet C.* (1989) 213 Cal.App.3d 86, 89 [261 Cal.Rptr. 470].)

Gail and James argued that Sonoma was a better facility for Michael because he needed 24-hour-a-day medical and nursing care, while a Senate Bill No. 962 Home is staffed by a registered nurse 40 hours per week and by licensed vocational nurses or licensed psychiatric technicians at other times. They added that a doctor was required to visit a Senate Bill No. 962 Home only once every 60 days and Michael would likely have to travel for medical care. They reminded the judge that Michael suffers from seizures and is a danger to himself as evidenced by his having pulled out his J tube in the past. They advised that they had visited Sonoma and were pleased with its services and believed that Michael would respond well to the continuity of a dormitory setting. They noted that Michael attended religious services at Agnews and the priest, who was being transferred to Sonoma, had assured them that he would watch over Michael in the event of Michael's transfer to Sonoma. Gail and James continued that Sonoma had on-campus day programs while a Senate Bill No. 962 Home would likely require travel for such activities.

Judge Brandt explained as follows.

"At the hearing, it was evident that the witnesses who testified for SARC supported transferring [Michael] to an SB 962 Home not only because the law requires them to place individuals with developmental disabilities in the least restrictive environment possible, but also because they have heartfelt compassion for the individuals they serve. The efforts of the Agnews staff to provide a smooth and effective transition upon Agnews' closure are significant and praiseworthy. They are working diligently to create accommodations in which their residents will receive all the dignity and respect to which they are entitled so that they will realize their full potential. The staff are taking the time to reassure residents' families that the treatment plans they are developing will address all the residents' medical, developmental, and personal needs. Ms. Castelli [(Director of the Regional Project of the Bay Area)] returned to the stand on multiple occasions and addressed the family's questions and concerns with patience and grace. Her input and guidance was very helpful and most appreciated. [¶] But it was also evident that [Michael's] family was motivated by their love and devotion to [Michael]. While they recognized the efforts Agnews is making to construct SB 962 Homes that provide comfortable community settings, they sincerely believe that, given [Michael's] very severe and significant developmental disabilities and medical issues, a developmental center is the least restrictive and best environment for him. The determination of what is the least restrictive environment must be based upon factors that are specific to [Michael's] individual needs. [Michael] has resided at Agnews for 22 years. From all the

evidence presented, it appears that Agnews has provided him an environment that has fully met all his medical, developmental and personal needs. The factors his family emphasized to support his continued residence in a developmental center were reasonable and compelling. Their continued love, devotion and preferences are additional factors that must be taken into account. When all the relevant factors are weighed and balanced, it cannot be found that an SB 962 Home is a less restrictive environment for claimant than a developmental center, especially given [Michael's] unique and severe medical needs and developmental disabilities. The family's request that [Michael] be transferred to Sonoma should be granted. If the family later decides that they would like [Michael] to be transferred to an SB 962 Home, they should be given the opportunity to seek such a transfer."

Judge Brandt suggested in her order that SARC might be able to obtain judicial review of her order via case authority. She stated: "To the extent that a judicial determination is required under *In re Hop*[, *supra*,] 29 Cal.3d 82, to effectuate [Michael's] transfer to Sonoma, SARC shall take all action necessary to obtain such a determination." And she ordered: "[Michael's] appeal is GRANTED. San Andreas Regional Center shall take all action necessary under *In re Hop*[, *supra*,] 29 Cal.3d 82, to obtain a judicial determination approving [Michael's] transfer to Sonoma Developmental Center." But she also noted: "This is the final administrative decision in this matter. Each party is bound by this decision. An appeal from the decision must be made to a court of competent jurisdiction within 90 days of receipt of the decision. (Welf. & Inst. Code, § 4712.5, subd. (a).)"

On January 27, 2009, the public defender filed a "Petition For a Review of Writ of Habeas Corpus Pursuant to In Re Hop and Notice Of Hearing" ostensibly on behalf of Michael but effectively on behalf of SARC. It asserted: "The Regional Center has identified alternative housing available in the community to meet the needs of [Michael]. The court is asked to review the attached Administrative Law Hearing Officer decision and findings on the matter. [¶] WHEREFORE, the attorneys for [Michael] request a determination that a Developmental Center does not constitute the least restrictive placement for [Michael]."[8]

At the hearing on March 5, 2009, the public defender appeared for Michael; the district attorney appeared for SARC; and Gail and James

---

[8] It is unclear why the public defender would represent Michael to challenge an administrative decision sought on Michael's behalf by Michael's coconservators. The coconservators' quest was unquestionably within their authority regardless of the conservatorship's nature. "[I]t may be that, in extraordinary circumstances, the statutory [conservatorship] procedures may be shown to be inadequate and to result in 'unreasonable consequences' greatly detrimental to the conservatee. [But the public defender made] [n]o such showing . . . here." (*In re Gandolfo* (1984) 36 Cal.3d 889, 899–900 [206 Cal.Rptr. 149, 686 P.2d 669].)

appeared for themselves. At the outset, SARC's attorney announced the following: "Your Honor, the San Andreas Regional Center's clinical opinion is that [Michael] can be appropriately placed in the community. There is an administrative hearing decision where an AOJ judge ordered a Sonoma packet—a packet to Sonoma to be filed. The regional center has done that. We just need a hearing—a ruling from Your Honor either way about what the least restrictive placement is and I don't anticipate calling any other witnesses." She clarified: "Administrative law judge—sorry—finding that Sonoma was the least restrictive placement. San Andreas Regional Center has sent a packet to Sonoma. [The public defender] is entitled to a hearing. We just need a Court—a ruling from the Court on either way as to what the least restrictive placement is and we'll follow that order. And so I don't have any additional witnesses."

Michael's attorney then called two witnesses who essentially reiterated the facts and opinions SARC presented in the administrative case. Gail and James then reiterated the facts and opinions that they advanced at the administrative hearing.

The trial court concluded as follows: "Okay. So the record is clear, the Court is taking judicial notice of the administrative law judge's decision which it's in the court file. And the Court finds it appropriate to do so. [¶] And quite honestly, there's a great deal of information contained there, which I believe is helpful to the process. All right. [¶] The matter before the Court today is what is called [a *Hop*] writ brought on behalf of the patient, Michael [K.]. And the Court in these hearings just as the administrative law judge did, is really to look at what is the—what is called the least restrictive placement for Mr. [K.]—Michael K[.]. And the Court is aware that Mr. [K.] has been at Agnews for approximately 22 years. He is clearly seriously disabled, both physically as well as mentally and developmentally, and it appears certainly to the Court that he has, over the years received excellent care at the facility where he is and the Court is certainly aware that—at least as I interpret between the lines here, honestly, that if the parents could find a way to keep this hospital open, that's what they'd do. Because they believe very strongly that it's the best option for him. And, folks, you are not alone in wishing that could happen. A lot of people have expressed that desire. Unfortunately, we are faced with the imminent closure of the facility. [¶] And the Court, after reviewing all of the evidence in this matter, at this time is going to grant the writ on behalf of Michael [K.], which essentially means that the Court is finding that the 962 home previously identified is at this time the least restrictive placement for Michael [K.]."

The trial court's written order states: "Pursuant to <u>In re Hop</u>[, *supra*,] 29 Cal.3d 82, a petition for writ of habeas corpus came before this court on March 2, 2009. [¶] . . . [¶] After hearing and considering all of the evidence presented at such hearing, the Court finds that the least restrictive placement is a Senate Bill 962 home ('962 home') that meets the medical, occupational, and developmental needs of [Michael] as identified by [SARC] and Agnews . . . . Accordingly, the petition for writ of habeas corpus is GRANTED."

## DISCUSSION

 "[I]t was the intent of the Legislature to supersede all common law remedies with those provided for in the Lanterman Act. Therefore, the only means by which [Gail and James], as [coconservators], could object to [SARC's] community placement decision was by invoking the statutorily authorized administrative fair hearing provisions of the Lanterman Act." (*Whitley, supra*, 155 Cal.App.4th at p. 1453.)

We have alluded to the procedural posture of this action whereby the public defender has undertaken to represent Michael only to advocate in favor of Michael's administrative adversary and against Michael's legal representatives.[9] The facts therefore defy a traditional pattern. But traditional principles of law nevertheless apply.

 " ' " 'Res judicata' describes the preclusive effect of a final judgment on the merits. Res judicata, or claim preclusion, prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them. Collateral estoppel, or issue preclusion, 'precludes relitigation of issues argued and decided in prior proceedings.' " [Citation.]' [Citation.] Collateral estoppel, or issue preclusion, has been described as a species of the doctrine of res judicata." (*Y.K.A. Industries, Inc. v. Redevelopment Agency of City of San Jose* (2009) 174 Cal.App.4th 339, 355, fn. 21 [94 Cal.Rptr.3d 424].)

 "The doctrine of exhaustion of judicial remedies is invoked where there has been a quasi-judicial adjudication by an administrative tribunal, whether in the public or private context. It requires a party aggrieved by such a decision to petition for relief in mandate in order to challenge the administrative action or findings before filing a legal action so as to prevent the adverse action or findings on issues actually litigated from taking on preclusive effect. [Citations.] Once an administrative decision has been

---

[9] The anomaly applies to Michael's appellate counsel as well.

issued, 'provided that decision is of a sufficiently judicial character to support collateral estoppel, respect for the administrative decisionmaking process requires that the prospective plaintiff continue that process to completion, including exhausting any available judicial avenues for reversal of adverse findings. [Citation.] Failure to do so will result in any quasi-judicial administrative findings achieving binding, preclusive effect and may bar further relief on the same claims.' " (*Y.K.A. Industries, Inc. v. Redevelopment Agency of City of San Jose, supra,* 174 Cal.App.4th at pp. 355–356.)[10]

■ Here, Gail and James objected to Michael's community placement and properly invoked the statutorily authorized administrative procedure to challenge that placement. Their position on behalf of Michael—the party in the proceeding—prevailed and their adversary, SARC, did not. SARC did not challenge the administrative decision via mandate proceedings in superior court and the decision became final. The decision therefore achieved binding, preclusive effect. The within petition seeks to relitigate the same claim among the same parties that the administrative decision put to rest. The trial court should have therefore denied the petition on the ground of res judicata.

The res judicata posture of this case is analogous to that in the case of *In re Gandolfo, supra,* 36 Cal.3d 889. There, the Orange County Superior Court determined that Stephen J. Gandolfo was gravely disabled. It therefore appointed James E. Heim as Gandolfo's Lanterman-Petris-Short Act conservator. (LPS Act; Welf. & Inst. Code, § 5000 et seq.) And it authorized Gandolfo's placement in a state hospital. Heim then placed Gandolfo in Stockton State Hospital. One year later, the Orange County Superior Court

---

[10] "For an administrative decision to have collateral estoppel effect, it and its prior proceedings must possess a judicial character. [Citation.] Indicia of proceedings undertaken in a judicial capacity include a hearing before an impartial decision maker; testimony given under oath or affirmation; a party's ability to subpoena, call, examine, and cross-examine witnesses, to introduce documentary evidence, and to make oral and written argument; the taking of a record of the proceeding; and a written statement of reasons for the decision." (*Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921, 944 [38 Cal.Rptr.3d 220, 126 P.3d 1040].) The fair hearing procedure unquestionably possesses a judicial character. At the fair hearing, "a claimant has '[t]he opportunity to be present in all proceedings and to present written and oral evidence'; '[t]he opportunity to confront and cross-examine witnesses'; '[t]he right to appear in person with counsel or other representatives of his or her own choosing'; '[t]he right to an interpreter'; and '[t]he right to access to records.' [Citations.] Absent good cause, the service agency presents its witnesses and all other evidence first and then the claimant presents his or her case. [Citation.] A recording shall be made of the proceedings at public expense. [Citation.] [¶] Within 10 working days of the fair hearing, the hearing officer must 'render a written decision' containing 'a summary of the facts, a statement of the evidence from the proceedings that was relied upon, a decision on each of the issues presented, and an identification of the statutes, regulations, and policies supporting the decision.' " (*Whitley, supra,* 155 Cal.App.4th at pp. 1460–1461.)

reappointed Heim[11] and found that Stockton State Hospital was the most suitable placement for Gandolfo. Two months later, Gandolfo filed a petition for a writ of habeas corpus in San Joaquin County Superior Court seeking an order that Heim place him in a suitable facility less restrictive than Stockton.[12] That court granted the petition after finding that Gandolfo was not gravely disabled to the extent that he had to stay in such a restricted environment. Heim appealed and the Supreme Court reversed the order because "The San Joaquin County court's subsequent granting of habeas corpus flew directly in the face of the Orange County court's determination as to a proper placement of Gandolfo, a matter we have concluded was 'exclusively within the jurisdiction of the [Orange County] court, and outside the scope of the writ of *habeas corpus*.' " (36 Cal.3d at p. 896.)

The undercurrent in this case is that *Hop* authorizes ongoing jurisdiction in the superior court to hear challenges to placement decisions or simply review an existing placement.[13] This is an incorrect interpretation of *Hop*.

"The central issue presented [in *Hop* was] whether the statutory scheme which permits the placement of 'non-protesting' developmentally disabled adults in state hospitals for an indefinite time meets the constitutional requirements of due process and equal protection of the laws." (*Hop, supra*, 29 Cal.3d at p. 86.)

"In *Hop* our Supreme Court considered whether a nondangerous developmentally disabled woman in need of state hospitalization, who was unable to provide informed consent, could be involuntarily admitted on a parent's application [citation], without a judicial hearing. The court ruled that her admission was unconstitutional and that she was entitled to a 'judicial hearing

---

[11] LPS Act conservatorships "terminate automatically after one year, at the end of which conservators must petition for reappointment with supporting medical evidence." (*In re Gandolfo, supra*, 36 Cal.3d at p. 897.)

[12] "Every adult who is or has been admitted or committed to a state hospital . . . as a developmentally disabled patient shall have a right to a hearing by writ of habeas corpus for his or her release . . . after he or she or any person acting on his or her behalf makes a request for release to any member of the staff . . . ." (§ 4800, subd. (a).)

[13] In addition to Judge Brandt's suggestion and the trial court's acceptance of *Hop* as authority to entertain the within petition, the record shows that the public defender had sought *Hop* judicial review of Michael's placement in 1994, 2004, and 2006. Michael's prior petitions generally request a hearing under *Hop* to determine the legality of his current placement or whether his current placement is warranted. They also cite section 4800 as authority but do not allege that Michael or any person acting on his behalf had made a request for release to any member of the staff at Agnews. (See, *ante*, fn. 12.) The record also indicates that the superior court apparently maintains a distinct *Hop* calendar for cases similar to this one.

on . . . whether, because of developmental disability she is gravely disabled or a danger to herself or others and whether placement in a state hospital is warranted.' [Citation.] Further, the court held she was entitled to the application of criminal due process standards, including the right to a jury trial, unanimous verdict, appointed counsel, and application of the standard of proof beyond a reasonable doubt." (*Whitley, supra,* 155 Cal.App.4th at p. 1465; see also *In re Gandolfo, supra,* 36 Cal.3d at p. 900, fn. 9 ["In *Hop* itself, we simply held that a developmentally disabled person 'is entitled to the *same* congeries of rights' as proposed conservatees under the LPS Act."]; *Cramer v. Gillermina R.* (1981) 125 Cal.App.3d 380, 393 [178 Cal.Rptr. 69] ["[A]ll that *Hop* held was that a developmentally disabled person initially committed by her mother under section 4825 is entitled to a judicial hearing to test the basis for the commitment."]; *North Bay Regional Center v. Sherry S.* (1989) 207 Cal.App.3d 449, 460 [256 Cal.Rptr. 129] ["The holding in *Hop* was that where a developmentally disabled adult is deemed incapable of consenting to admission to a state hospital, he or she cannot be admitted, without a hearing, solely on the application of a parent."]; *In re Violet C., supra,* 213 Cal.App.3d at p. 94 [*Hop* did not "create a new nonstatutory involuntary judicial commitment" procedure]; *In re Borgogna, supra,* 121 Cal.App.3d at p. 946 [*Hop* does not address the issue "where the center seeks to deescalate or make less restrictive the placement, but the ward opposes such a transfer"].)

In short, " ' "[A]ll that *Hop* held was that a developmentally disabled person initially committed by her mother under section 4825 is entitled to a judicial hearing to test the basis for the commitment." ' " (*Whitley, supra,* 155 Cal.App.4th at p. 1465.)[14]

 "By contrast, the question presented here is whether [Michael] should remain [in a state hospital] or be placed in a community placement . . . . The due process concerns for retention in a development center are

---

[14] The court also held that the public defender had standing to bring the habeas corpus petition on Hop's behalf without Hop's consent because exceptional circumstances existed. The circumstances noted were that Hop had neither a guardian nor conservator, the commitment was initiated by Hop's mother with the concurrence of the regional center and hospital staff (all of whom were unlikely to institute a habeas proceeding to review the propriety of their own actions), and Hop had no ability to protest her placement or initiate a habeas corpus proceeding. (*Hop, supra,* 29 Cal.3d at pp. 86–87.) We observe that none of these circumstances exists in this case, given that Michael had coconservators who were competent and authorized to make Michael's choice to stay in a state hospital rather than be released to a less restrictive placement. (Cf. *In re Borgogna, supra,* 121 Cal.App.3d at p. 947 [applicable statutory scheme permitted competent adult with a developmental disability to resist transfer from state hospital to community placement because "choice [is] the first consideration if he is competent to choose"].) The public defender's lack of standing is a second, independent reason why the trial court should have denied the petition in this case.

not the same due process concerns that are present when a developmentally disabled individual is first involuntarily committed. [Citation.] Accordingly, the expansion of remedies beyond those provided in the fair hearing statute does not come as a natural evolution of *Hop*—it is in derogation of the express will of the Legislature in establishing a fair hearing procedure." (*Whitley, supra,* 155 Cal.App.4th at pp. 1465–1466, fn. omitted.)

## DISPOSITION

The order for placement is reversed. The trial court is directed to enter an order denying the petition for a review of writ of habeas corpus.

Rushing, P. J., and Elia, J., concurred.

A petition for a rehearing was denied July 13, 2010, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied September 22, 2010, S184875.